(No. 33363.—

TOWER CABANA CLUB, INC., Appellee, *vs.* THE CITY OF
CHICAGO, Appellant.

*Opinion filed January 21, 1955—Rehearing denied Feb. 15, 1955.*

JOHN J. MORTIMER, Corporation Counsel, of Chicago, (L. LOUIS KARTON, and ARTHUR N. HAMILTON, of counsel,) for appellant.

OSCAR A. BROTMAN, and LEON N. MILLER, both of Chicago, (WILLIAM C. WINES, and ODE L. RANKIN, of counsel,) for appellee.

Mr. CHIEF JUSTICE BRISTOW delivered the opinion of the court:

Appellee, Tower Cabana Club, Inc., an Illinois corporation, filed its action for a declaratory judgment in the circuit court of Cook County against appellant, city of Chicago, seeking to have the Chicago zoning ordinance of 1942 declared invalid and unenforceable as to plaintiff's property. The city filed an answer and the appellee its reply. Proofs were taken before a master and the court, after examining the record, entered a judgment finding and declaring the amendatory ordinance of 1942 invalid as applied to appellee's property and declaring that appellee and its successors have the right to use the subject premises for any of the purposes permitted under sections 7 and 8 or the original Chicago zoning ordinance of 1923. The judgment also enjoined the city, its agents, officers and employees from enforcing the provisions of the amendment

against appellee's property and ordered them to issue such necessary permits as might be needed for the erection and maintenance of any building or buildings on the property for any purpose allowed under sections 7 and 8 of the original ordinance. The city has taken a direct appeal to this court on the certified ground that the validity of a municipal ordinance is involved.

The stipulations relative to the zoning ordinances and maps in evidence show that the Chicago zoning ordinance of 1923 placed the subject premises in an apartment district except for a strip 125 feet wide on its north side along West Peterson Avenue which was zoned for commercial use. By an amendatory ordinance enacted December 3, 1942, the zoning classification of the entire tract was changed to single-family residence. Section 7 of the original ordinance of 1923 relating to apartment districts provided for certain auxiliary uses including private dining halls, dormitories, printing presses, student laboratories or workshops, playgrounds, athletic field or other customary facilities connected with an R 2 use which was defined as including "every use as golf or tennis grounds or similar use, church, convent, parish house, public recreation building, music school, university, public school, dancing school, and so forth." Section 8 of the original ordinance, in designating the uses permitted in a commercial district, designated, *inter alia,* metal planing, shaping, bending, grinding, milling, drilling, die sinking, forging (except M use), coring, punching, stamping, pressing, soldering and welding. The judgment permits any of the aforesaid uses.

The property in question is owned by the Sanitary District of Chicago. It is a part of the right of way originally acquired for the construction of the North Shore Channel from the north branch of the Chicago River to a point between Evanston and Wilmette which was designed to take water from Lake Michigan and receive the sewage of Evanston and neighboring municipalities. The particular

tract, now vacant, was formerly occupied by a large number of house trailers and trailer homes. It is bounded on the north by West Peterson Avenue, on the east by a 50-foot strip adjoining the North Shore Channel, on the south by West Ardmore Avenue, if extended, and on the west by an alley next east of and parallel to North Kedzie Avenue. The subject property is only approximately 228 feet wide east and west, but it extends south from Peterson to Ardmore, a distance of two city blocks or approximately 1300 feet. Sewers and water mains installed upon the property at the time it was occupied by the trailers are still in place but a temporary extension of North Albany Street along the west line of the tract has been abandoned. The property lies about 167 feet east of Kedzie Avenue but no part of it fronts on that street.

The streets from West Peterson Avenue south as they intersect Kedzie are Thorndale, Ardmore, Victoria, Hollywood, Olive and Bryn Mawr Avenue in that order. Victoria and Olive are half-block streets terminating at the west line of Kedzie. Thorndale, Ardmore and Hollywood cross Kedzie and terminate at the west line of the Sanitary District property. Peterson and Bryn Mawr are through streets which cross the North Shore Channel. It is four blocks from Bryn Mawr (5600 north) to Peterson (6000 north). Kedzie Avenue north of Peterson Avenue is known as Jersey Avenue. The latter intersects Lincoln Avenue at a point about two blocks north of Peterson. From this intersection Lincoln Avenue extends northwest and southeast. It intersects Peterson Avenue at a point east of the North Shore Channel and about three fourths of a block east of the northeast corner of the subject property. Peterson Avenue is a main east-and-west traffic artery 100 feet wide designed to accommodate six lanes of traffic. Lincoln Avenue is also a 100-foot wide traffic artery. Kedzie and Jersey, its extension to the north of Peterson, are only 66 feet wide.

The corner properties where Kedzie intersects Peterson are all vacant. On the northeast corner of the intersection of Peterson and Lincoln is a large shopping district known as "The Center." On the north side of Lincoln Avenue where Jersey intersects it, is a large shopping center known as "Lincoln Village." On Jersey in the block north of Peterson two new residences are under construction on the west side of the street and in the same block three new residences have already been built and three more are under construction on the east side of the street. Further north, at the southeast corner of Jersey and Lincoln, a motel is under construction. Peterson Avenue for a considerable distance east and west of Kedzie is entirely confined to business uses. To the south on Kedzie between Peterson and Bryn Mawr the property is now all zoned for single-family residences. It is to a large extent vacant, but many new residences have been recently constructed or are being constructed. The uses are as follows: On the west side of Kedzie between Peterson and Thorndale there is a public park and playground primarily used by the people of the neighborhood; on the east side of Kedzie in the same block is a structure 15 feet by 10 feet used by the Chicago Transit Authority in connection with a "bus turnaround" as a waiting and rest room for employees. In the same block on the same side of the street there are four new single-family residences. On the west side of Kedzie between Thorndale and Ardmore there are two new single-family residences and two more under construction; on the east side of Kedzie in the same block there is one new single-family home and a converted three-apartment house. On the southwest corner of Ardmore and Kedzie there is an apartment building and further south on the west side of Kedzie between Victoria and Hollywood there are two new single-family residences and a building of warehouse type occupied by the Mayfair Construction Company. On the east side of Kedzie south of Ardmore there are two new

single-family residences, a six-room residence and a new
de luxe ranch-type home. On the southwest corner of
Hollywood and Kedzie there is an apartment building and
to the south on the west side of Kedzie between Hollywood
and Bryn Mawr there are two large residences under con-
struction and a small milk station and gasoline filling sta-
tion on the northwest corner of Bryn Mawr and Kedzie.
On the east side of Kedzie south of Hollywood is a thirty-
year-old public garage having a capacity of 65 cars which
occupies 100 feet facing Olive. There is also a small frame
real-estate office near Bryn Mawr. The residences in this
area range in value from $18,000 to $35,000, the average
being about $20,000. The back yards of those residences
on the east side of Kedzie abut a sixteen-foot alley which
is all that separates them from the Sanitary District prop-
erty. South of Bryn Mawr, Kedzie Avenue is a street of
mixed uses, with hundreds of stores, businesses, factories
and some residence property.

Appellee, Tower Cabana Club, leased the subject prop-
erty from the Sanitary District for a term of fifty years be-
ginning on March 1, 1954. It proposes to construct on the
property a large heated and filtered swimming pool, 100
by 40 feet in size, and two rows of two-story cabana build-
ings running north and south of either side of the pool
containing about 150 cabanas. In addition there would be a
wading pool for small children, playground equipment, a
snack shop and a shelter for use during inclement weather.
It is proposed that one of the cabanas contain a beauty
shop. The grounds would be completely landscaped with
appropriate walks, lawns and flower gardens. Southern-
most would be the parking area with ample facilities for
off-street parking for members and guests. Access to this
area would be through Ardmore and Kedzie. The plans
show no entrance off Peterson Avenue. The entire enter-
prise would be operated as a private club. Memberships
would be sold for a fixed amount to some 150 members and

the facilities would be available to them and their families and from three to five guests per week each. Operation during night hours and the winter months is not planned. The cost of the entire project would be about $250,000.

The expert testimony as to the highest and best use of the property was conflicting. Harry R. Thornton, a real-estate agent and appraiser of many years experience in the general locality, testified for appellee. He had appraised the property for the Sanitary District prior to the actual leasing to appellee. He gave it as his opinion that the highest and best use of the property was for recreational purposes and that its use as a cabana club would not be detrimental to nearby residences. He stated that the property would not be suitable for single-family residences because of the lack of improvements by way of streets, curbs and sidewalks, the proximity to the North Shore Channel and the difficulty to be encountered in financing private residences on leased property, having due regard to the policy of the Sanitary Commission to lease rather than to sell any of its properties. He considered the property worthless in its present state for single-family residences, estimated it would be worth $40 per foot for residences with the improvements in, and the improvements would cost $35 per foot. If restrictions were removed the property would be worth $20 per foot in its present state. It was his opinion that the uses on Kedzie south of Bryn Mawr have no effect on the subject property.

Earl Derx, the real-estate manager for the Sanitary District, when testifying as a witness for appellant, explained that while the Sanitary District is empowered to sell its property, it is its present policy to lease rather than to sell. The same witness when called by appellee stated that he had no opinion as to whether or not the leased property could be used for the construction of private residences and could not answer as to the possibility of financing the construction of private residences on leased property.

C. H. Seneco, a real-estate broker for many years, and Carl L. Gardner, an expert in city planning, testified for the city. Their testimony supported all factual contentions made by the city, namely, that the highest and best use of subject property was for residential purposes and that the proposed improvement would have an adverse effect upon the homes in that area. Eight residents in the area, seven of whom were homeowners, testified for appellant. Uniformly, they were opposed to the project. Invariably, their testimony was weakened by the showing on their cross-examination that their conclusions were not well founded. Directly across the street from one of the witnesses is Hollywood Park Playgrounds. He had testified that the noise from the proposed Tower Cabana Club would "disturb the peace and sanctuary of his home." But the activities on the playground had no such effect. Then this question: "Assuming that the noises emanating from the Cabana Club would be no greater than those emanating from the Hollywood Park Playgrounds, would you still object to the project?" Answer: "I would." A majority of the objecting homeowners who testified had previously been canvassed by Esther Brotman, secretary of appellee corporation, as to their attitude toward the proposed improvement. Some were in favor of it, and none seemed to register serious opposition. Evidence also conflicted as to present traffic conditions on Kedzie in the vicinity of the subject property. Appellee's witness Thornton testified that traffic was heavy but several homeowners in the vicinity who testified for appellant stated that the traffic on Kedzie north of Bryn Mawr is light and mostly local.

The question presented for decision is whether the amendatory ordinance of 1942 as applied to appellee's property is arbitrary, unreasonable and capricious or whether it is reasonable and bears a substantial relation to the public health, safety, morals and welfare. This question is subject to review by the courts and each case must be decided on

its own particular facts. (*Eleopoulos* v. *City of Chicago,* 3 Ill. 2d 247; *Trust Co. of Chicago* v. *City of Chicago,* 408 Ill. 91; *People ex rel. Joseph Lumber Co.* v. *City of Chicago,* 402 Ill. 321.) It is primarily the province of the municipal body to which the zoning function is committed to decide the question of proper use and draw the line of demarcation, and the courts will not interfere with the discretion with which such bodies are vested unless the legislative action is shown to be arbitrary, capricious or unrelated to the public morals, safety and general welfare.

Only recently this court stated in the case of *Eleopoulos* v. *City of Chicago,* 3 Ill. 2d 247, 120 N.E. 2d 555, "The general scheme of zoning may be valid, yet, when applied to a particular piece of property and a particular set of facts and circumstances it may be so arbitrary and unreasonable as to result in a confiscation of the property. In that situation, as applied to the disputed real estate, the ordinance is void. *Village of La Grange* v. *Leitch,* 377 Ill. 99; *People ex rel. Kirby* v. *City of Rockford,* 363 Ill. 531."

There was a prolonged colloquy between the trial court and counsel on both sides concerning a question not raised in the pleadings, namely, does the city of Chicago, a municipal corporation, have jurisdiction to zone property belonging to another municipal corporation, the Sanitary District of Chicago? The trial judge, however, in deciding the case predicated his conclusions upon a different ground, stating: "I do not want it understood that what I said in the discussion between counsel and court represents the sole reason for my decision. There are other reasons. The frontage of this property is along Peterson Avenue, which is a six-lane artery, and zoned for either business or commercial uses between Crawford and Western Avenue, with the exception of the 277 feet of the Sanitary District property, which was lately rezoned from commercial usage to single-family residences. Beyond the front lot on Peterson Ave-

nue, the property in question here was zoned for apartment uses, and it was rezoned to single-family residences. The evidence indicates that the single-family residence use is not the most feasible zoning. The contemplated use by the plaintiff of the property in question is permissible in business, commercial or apartment-house zoning. Under the circumstances, I hold that there is no substantial relationship between the limitations of the use placed upon the plaintiff's property, and the public welfare. I cannot see how health, morals, safety or comfort of the community could be in the slightest way affected by the use to which the plaintiff desires to put his property, but if affected at all, it would seem to me from the evidence that it would be favorably affected."

It is apparent therefore that the judgment entered in the trial court was predicated upon the determination that the rezoning of the subject property was unreasonable and void when applied to the particular piece of property under consideration.

A study of the photographs and the proof adduced at the trial clearly reveals that the entire neighborhood surrounding the subject property abounds with commercial uses in almost every direction and in a close proximity. On both sides of Kedzie Avenue, from Bryn Mawr to Lincoln Avenue, there are mixed improvements: vacant lots, a milk store, a gas station, real-estate office, garage, factory-type building, apartments, garage-type building and motel.

The photographs of the subject property portray a most unsightly spectacle, and you will find an undeveloped neglected area that has been a gathering place for refuse. It is covered with weeds and debris. As we have heretofore indicated the property was formerly occupied by house trailers and trailer homes. This type of occupancy is characteristic where tenancy is terminable. The Sanitary District will not sell—it only leases. Builders of expensive

homes will not be interested in lots when they only enjoy a leasehold interest. Loaning agencies will not invest their capital in a building project when the homeowners and borrowers do not own the fee. Another factor that condemns the subject property as a residential site is its close promixity to the Sanitary District Canal. There are many good reasons why homebuilders avoid such a location. We think, in light of the foregoing, that it is only fair to conclude that the area in question will never be developed residentially. It is likely to remain forever a veritable eye sore. The plaintiffs introduced into evidence photographs of a recreational center that is in operation elsewhere and state that the proposed improvement of the subject tract will follow that pattern. It will be an attractive and delightful contribution to the neighborhood. What little disadvantage may accrue to the neighborhood in the way of noise and increased traffic seems most trivial and insignificant when compared to the many advantages attending this improvement. Adding another commercial use to the many that are interspersed throughout the surrounding territory, converting a waste land into a place of beauty, will not prove to be damaging to the owners of homes in this area. On the contrary it should prove surprisingly beneficial.

Therefore, it is our considered judgment, after a careful study of the record, that the questioned rezoning ordinance, restricting the subject property to single-family residences is unreasonable and void, having the effect of depreciating the values of the Sanitary District property without correspondingly benefitting the public generally. The judgment entered by the trial court is affirmed.

*Judgment affirmed.*