(Nos. 34354, 34355, Cons.—

Otto A. Bauske *et al.*, Appellees, *vs.* The City of Des Plaines, Appellant.

*Opinion filed Nov. 20, 1957—Rehearing denied Jan. 20, 1958.*

170

SCHAEFER, J., DAVIS, C.J., and HERSHEY, J., dissenting.

MARSHALL S. HOWARD, of Chicago, for appellant.

DWIGHT H. GREEN, JOHN G. POUST, WERNER W. SCHROEDER, FRANK P. ZALESKI, and SAMUEL T. LAWTON, JR., all of Chicago, for appellees.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

The defendant, city of Des Plaines, appeals directly to this court from a declaratory judgment of the circuit court of Cook County declaring void the city's zoning ordinance classifying plaintiffs' property for residential use. Two cases were originally filed by the separate plaintiffs, owners of adjacent and ajoining tracts of real estate. The cases were consolidated in the trial court below and referred to a master in chancery for hearing. The master heard the evidence and reported his findings in favor of the plaintiffs and recommended the entry of a judgment for plaintiffs, after overruling objections to his report. Such objections stood as exceptions, were heard by the trial court, and were overruled. The master's report was approved, and judgment entered in both cases in accord therewith.

The trial judge certified that the cause involves the validity of a municipal ordinance and that, in his opinion,

the public interest requires an appeal directly to this court. We entertain this direct appeal under section 75(1)(c) of the Civil Practice Act, as amended.

The record is voluminous. In addition to many lay and expert witnesses, the record includes exhibits consisting of aerial and ground photographs, land-use and zoning maps and many other visual aids in the form of graphs, charts, and projections. The master in chancery in his report, consisting of 91 pages, required almost 50 pages to abstract the evidence heard. A summary will suffice here.

Plaintiffs own approximately 138 acres of land. It is situated generally in the southernmost portion of the city of Des Plaines. It is bordered on the north by Howard Avenue, and on the south by Touhy Avenue. Touhy Avenue is a two-lane, paved, main county highway. The greater portion of property is bordered on the west by Mannheim Road. Mannheim Road is a heavily-traveled, four-lane, Federal through highway. A segment of the subject property is located west of Mannheim Road and south of Howard Avenue. The subject property is traversed from north to south by the main line of the Wisconsin Central Railroad, commonly known as the Soo Line.

For more than 25 years and up to the present time, the subject property has been used by the plaintiffs in the business of growing, producing, packaging and marketing flowers and plants. Its facilities consist of 25 large greenhouses covering 17 acres. Attendant thereto are large boiler plants equipped with chimneys 125 feet and 180 feet in height. The plant facilities are such as to require servicing by the Soo Line Railroad. To meet this need, the railroad has extended spur and switch tracks from its main line to the plaintiffs' plants to handle plaintiffs' volume of freight. Portions of the plaintiffs' property not actually occupied by productive facilities are used by the plaintiffs for the storage of quantities of coal, manure, water and the like. A large portion of the subject property is vacant and un-

occupied, and for at least 40 years has not been used. These unused portions tend to be low and swampy. Aside from those land improvements serving the greenhouse area, the property is completely unimproved.

The adjacent property running north from the subject property is largely residential. It is built up with duplexes and single-family residences, which would be generally classified as moderately priced. Those dwellings which face the property immediately on the north were constructed during and after World War II as emergency shelter, were intended as temporary construction, and sold for $6,500 per unit. Some of these dwellings were modernized as to plumbing and heating, though all of them are of inferior construction. Also immediately north of the subject property is a small area which is zoned as commercial. At the southeast corner of Howard Avenue and Mannheim Road is a public service substation. Across the railroad and highway to the northwest from the subject property is an elevated water storage tank belonging to the city of Des Plaines, and a company which manufactures and repairs saws.

Northeast of the property is a scattered residential area, some of which is vacant. The defendant adduced testimony of a proposed building development, on part of the vacant area, to contain 55 single-family residences to cost from $25,000 to $35,000.

Due east from the property in question, running for a distance of about one-half mile, are several streets improved by new residence buildings in the moderate price class. To the southeast of the property is scattered residential development.

There is almost no residential development adjacent to Touhy Avenue, which borders the subject property on the south. There are but six houses on the south side of Touhy Avenue across from the subject property. The evidence indicates that in this area the land is generally not well

suited for residential development, owing to the fact that the water level is but three feet from the surface. But farther south therefrom exists an extensive residential development of moderately-priced, single-family dwellings. A gasoline service station is located at the southwest corner of Touhy Avenue and Mannheim Road. Immediately south of the station is a vacant 33-acre tract. West of Mannheim, along Touhy Avenue, the land is vacant save for an occasional dwelling. About one-half mile west of the intersection of Mannheim Road and Touhy Avenue is an academy for girls.

That area adjacent to the premises in question which is north of Touhy Avenue and west of Mannheim Road has been vacant and unoccupied for many years. The defendant produced testimony that a development for 55 single-family residences was proposed to occupy about 40 acres of that land, the residences to be priced from $21,000 up.

O'Hare International Airport, as it is presently expanded, almost adjoins the subject property at the southeast corner. Its runways are less than a mile away from the property. As a result, planes must fly directly over the subject property at low altitudes in taking off and landing from the field.

The defendant city is a residential suburb located northwest of the city of Chicago. At the present time, 5.39 per cent of its area is zoned for industrial purposes. A new city plan, approved by the city planner but not officially adopted by the city, discloses a proposal to annex territory south and west of the present residential area, and to allocate therefrom 13.6 per cent to industrial uses. Those proposed additional industrial areas are beyond the present city limits. Under the existing zoning ordinance of the city, the plaintiffs' property is zoned and classified as being within the residential classification.

Plaintiffs propose an industrial development for the subject property. It would consist of approximately 26 sepa-

rate industrial sites. The enterprises to be installed would be housed in single-story buildings, relatively uniform in architecture and design, built with adequate setbacks from the street, and providing parking facilities for 2,899 vehicles. Plaintiffs propose landscape improvements to enhance the property aesthetically. Special emphasis would be placed upon a greensward and shrubbery improvement at the north and east boundaries. It is suggested that this would act as a buffer between the industrial development on the subject property and the only existing residential development presently located adjacent to the plaintiffs' property. Present railroad and switch track facilities would be augmented by additional facilities to accommodate the incoming industrial establishments. A traffic control plan is proposed, where ingress and egress of vehicular traffic would be restricted to Mannheim Road and Touhy Avenue, thus insulating the residential area from additional traffic.

The master in chancery and the trial judge considered thoroughly the evidence introduced, in all its details. They analyzed the history of the area, the existing land use of the subject property, the existing land use of adjacent, contiguous and surrounding property, the proposed development of the subject property and its probable impact on the defendant city, and the general trend for future development of the over-all area complex. The several factors affecting governmental tax revenues, school facilities, requirements for governmental services, such as police and fire protection, were carefully evaluated. Finally, the master and the trial judge considered the highest and best use of the subject property and the questions of land values involved.

In considering the present land uses, the master and the trial judge noted that the subject property lies in a neighborhood which was originally laid out for industrial uses. One of the original factories in the area, but a few blocks from plaintiffs' property, is still in existence. They found

that the saw factory at the northwest corner of the property, the gasoline station at the southwest corner, the nearby elevated water storage tank, the public service electric distribution point at the northwest corner, and other industrial uses in the area lent it an industrial flavor. The presently existing use of the subject property itself has a marked industrial composition. They found that the present use of the property encompassed a steady influx of supplies over the switch tracks, including coal, lumber, manure, and chemicals. They further noted the existence of large reservoirs containing water, which are and have been maintained on the property. They further noted the existence of substantial underground installations for the purpose of adapting the soil to the plaintiffs' uses. They noted also that the plaintiffs utilized the services of many trucks in the operation of their businesses, and that they employed upwards of 90 men. They noted that the plaintiffs used thousands of tons of coal to fire their boiler plants, resulting in a pall of black smoke, cinders, and odors over the area. Finally, they found that the subject property itself is low and swampy. Upon the foregoing basis, the master and the trial court concluded, we think properly, that the present use of the property is essentially industrial.

In determining the question of reasonableness of the ordinance involved insofar as it restricts the plaintiffs in the use of their property, the master and trial judge were mindful of the burgeoning transportation facilities which mark the area. They considered not only those in present use, but also those which will became available within the very near future.

In that connection, Mannheim Road is one of the most intensively used, four-lane, arterial highways which traverses the western perimeter of the greater Chicago metropolitan area. Over 14,000 vehicles daily pass the subject property on Mannheim Road. A substantial increase in that traffic is anticipated in the future. Touhy Avenue, which is

a two-lane highway, is now subject to an extensive expansion program, which program has already been put into effect but a few miles to the east and is expected to include that portion of Touhy Avenue which borders plaintiffs' property. Further, the Tri-State Branch of the new toll road is less than a mile east of the property. The North Illinois route thereof is within three-quarters of a mile to the south. That will operate as an additional direct through traffic link.

The existence of the Soo Line Railroad traversing plaintiffs' property has already been noted. The master and the trial judge found that the Soo Line is a major freight line; that 21 trains cross the site daily; and that the spur tracks from the main line to the plaintiffs' property have serviced the plaintiffs for more than 25 years.

In considering traffic and transportation influences upon the property and the surrounding area, the master and the trial judge were impressed by the expected impact of the new Chicago International Airport at O'Hare field.

That airport is situated but three-quarters of a mile from the subject property. When the present published plans for the airport are implemented, it will be some fourteen times as great as Chicago's Midway Airport. The Chicago International Airport, owing to the volume and intensity of freight and passenger transport from all parts of the world, will soon become one of the largest and busiest air centers on the face of the earth. To meet the spiraling trend to increased air transport, and the demands for such mode of transportation to service the Chicago metropolitan area, three great runways are to be installed at O'Hare Field. A projection of its principal runway, now in use, bisects the subject property, so that even today upon take-off and landing, aircraft fly over the property at an altitude of but 150 feet, so that the present use of the airfield already affects adversely the quiet and tranquility of the subject property and its environs.

We agree with the conclusion that the impact of this development is one compelling factor in determining whether or not the restriction in question is reasonable. It was concluded that the several modes of transportation make the tract in question, and the area surrounding it, a focal point of rail, highway, and air traffic.

In considering the nature of the surrounding area, and in considering the city's present zoning and planning, it should be noted that the city planner, defendant's principal witness, himself described the present zoning as "chaotic." He testified that there were seven different areas containing 20 to 40 acres each, which were given different zoning classifications; that commercial areas and industrial areas were placed next to residential areas. The master detected a pattern of "leap frog" zoning, which we disapproved in *Zilien* v. *City of Chicago*, 415 Ill. 488.

The defendant city is attempting to evolve a new comprehensive zoning plan designed to meet the needs of presently existing conditions. The master and trial judge observed that in its early stages the plan permitted industrial use of the subject property. Succeeding redrafts allowed variously for greenhouses, laboratory research and finally for residential use.

The changes were predicated upon the intention that areas presently outside of defendant's territorial limits would be annexed and made available for industrial purposes. The master and trial judge concluded that this proposed solution did not properly evaluate the factors heretofore analyzed and ignored what was manifestly the highest and best use of the subject property, namely industrial.

After a full consideration of all the voluminous, and sometimes contradictory, testimony from both plaintiffs and defendant as to the highest and best use of the subject property and as to compartive values, the master and the trial judge concluded that the highest and best use of the property was for industrial purposes. They found the pres-

ent value of the property for industrial use was $11,000 per acre, for residential use as now restricted, $3,000 per acre. They also found that if the present restriction were upheld, it would deprive plaintiffs of land value in the amount of $2,500,000. Plaintiffs' property bordering the railroad would have no value whatsoever, in that it is completely unsuitable for residential purposes.

The master and the trial judge observed that the hardship to the plaintiffs would be heavy in that they would be substantially deprived of the greater part of the value of their property, and that there would not be a corresponding benefit to the defendant city, which at best could be but slight or conjectural. They indicated that in their view greater benefits would accrue to the defendant city if the subject property were put to the intended industrial use.

On the basis of the foregoing analysis and factual conclusions, it was concluded that the Des Plaines zoning ordinance, as it applies to the plaintiffs' property, does not bear any reasonable relation to the public health, safety, morals, comfort or general welfare, and that it is harsh, arbitrary, discriminatory, prohibitive, offensive and confiscatory, and is therefore repugnant to the constitutions of the State of Illinois and of the United States, and consequently void. In this we concur.

The defendant contends that the voiding of the ordinance will result in spot zoning, and the plaintiffs have only demonstrated that they can make more money by using the land as they have in the past. They also argue that residents in neighboring residential areas are entitled to rely upon the continuance of the zoning ordinance. They further contend that the plaintiffs have not proved their case by a preponderance of the evidence and, further, have failed by clear and convincing proof to overcome the presumptive validity of the ordinance. They further urge that the ordinance does bear a direct and substantial relation to

the health, safety, comfort, morals and general welfare, and is consequently valid and enforceable.

The greater Chicago metropolitan area is participating in an unprecedented expansion. Busy highways are fanning out in all directions from the metropolis, with the suburbs and even remote areas witnessing a tremendous growth in population, commerce and industry. In terms of size, intensity and tempo of acceleration, the northwest suburban section surrounding Chicago, of which the defendant is almost the center, is undergoing some of the greatest of these changes. In recent years this court has considered and passed on many legal and constitutional questions arising out of the numerous problems of adjustment incident to these economic and social changes in our lives. Those cases have uniformly gone into the question of the relationship of a restrictive zoning ordinance to the public health, safety and general welfare, in determining the constitutionality of such ordinance as a valid exercise of the police power when applied to a particular plaintiff or tract of land. Uniformly those cases involve the application of a test of reasonableness.

In *La Salle National Bank* v. *County of Cook,* 12 Ill.2d 40, we had occasion to review, in a similar factual context, the cases and propositions of law that control here. We said in that case:

. "It is well established that it is primarily the province of the municipal body to determine the use and purpose to which property may be devoted, and it is neither the province nor the duty of the courts to interfere with the discretion with which such bodies are vested unless the legislative action of the municipality is shown to be arbitrary, capricious or unrelated to the public health, safety and morals. *Wechter* v. *Board of Appeals,* 3 Ill.2d 13.

"By the same token, however, if the restrictions imposed bear no real and substantial relation to the public health, safety, morals, comfort and general welfare, the

ordinance is void. *Pringle v. City of Chicago*, 404 Ill. 473; *Hannifin Corp. v. City of Berwyn*, 1 Ill.2d 28; *Tower Cabana Club, Inc. v. City of Chicago*, 5 Ill.2d 11; *Petropoulos v. City of Chicago*, 5 Ill.2d 270; *Krom v. City of Elmhurst*, 8 Ill.2d 104; *Regner v. County of McHenry*, 9 Ill.2d 577.

"A zoning ordinance is presumptively valid (*Galt v. County of Cook*, 405 Ill. 396), this presumption may be overcome only by clear and convincing evidence (*Midland Electric Coal Corp. v. County of Knox*, 1 Ill.2d 200), and the burden of proof is on the plaintiff. *Krom v. City of Elmhurst*, 8 Ill.2d 104.

"Even though the validity of each zoning ordinance must be determined on its own facts and circumstances (*Galt v. County of Cook*, 405 Ill. 396; *People ex rel. Alco Deree Co. v. City of Chicago*, 2 Ill.2d 350) yet an examination of numerous cases discloses that among the facts which may be taken into consideration in determining validity of an ordinance are the following: (1) The existing uses and zoning of nearby property, (*Krom v. City of Elmhurst*, 8 Ill.2d 104; *Forbes v. Hubbard*, 348 Ill. 166; *Langguth v. Village of Mount Prospect*, 5 Ill.2d 49), (2) the extent to which property values are diminished by the particular zoning restrictions, (*Midland Electric Coal Corp. v. County of Knox*, 1 Ill.2d 200, 214; *Offner Electronics, Inc. v. Gerhardt*, 398 Ill. 265; *People ex rel. Kirby v. City of Rockford*, 363 Ill. 531; *Ehrlich v. Village of Wilmette*, 361 Ill. 213), (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public, (*Chicago Title and Trust Co. v. Village of Franklin Park*, 4 Ill.2d 304, 306; *Krom v. City of Elmhurst*, 8 Ill.2d 104, 115; *Evanston Best & Co. v. Goodman*, 369 Ill. 207), (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner, (*Hannifin Corp. v. City of Berwyn*, 1 Ill.2d 28, 36), (5) the suitability of the subject

property for the zoned purposes (in this cause residences on 10,000 square feet), (*Langguth* v. *Village of Mount Prospect,* 5 Ill.2d 49, 54; *Petropoulos* v. *City of Chicago,* 5 Ill.2d 270, 274), and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. *Krom* v. *City of Elmhurst,* 8 Ill.2d 104, 111-113; *Chicago Title and Trust Co.* v. *Village of Franklin Park,* 4 Ill.2d 304; *Petropoulos* v. *City of Chicago,* 5 Ill.2d 270, 274."

The defendant has complained that the evidence was insufficient. Mere conflict in testimony as to the highest and best use of property, the impact of the proposed land use on the areas involved or its effect upon property values, does not make irrebuttable the presumption that an ordinance is valid. A difference of opinion does not render the evidence of one party unbelievable, or require a finding that the reasonableness of an ordinance is debatable. In a trial before the court without a jury, the credibility of witnesses and the weight to be accorded their testimony are still to be determined by the trier of fact. Unless manifestly against the weight of the evidence, his findings will not be disturbed. *Northern Trust Company* v. *City of Chicago,* 4 Ill.2d 432.

We find ourselves in accord with the conclusions of the master and trial judge that the highest and best use of the subject property is industrial; that it is not well suited for residential development; that industrial use would be compatible with the public welfare; and that the zoning restriction is without substantial relation to the general welfare. We think that those findings are not only amply supported by the record, but that the trial court and master alike applied the standards this court has set to the facts in this case both conscientiously and with logical rigor.

It is not the monetary loss to the plaintiffs which here compels a finding of invalidity, but that such loss is utterly

unrelated to any substantial public benefit to be derived. The testimony of the defendant's witnesses does not alter our conviction that the plaintiffs established their case by clear and convincing evidence.

For the foregoing reasons, we conclude that the trial court's judgment was correct and should be affirmed.

*Judgment affirmed.*

Mr. Justice Schaefer, dissenting:

By its decree the trial court rezoned for factory uses an area of 138 acres in the city of Des Plaines. The entire tract is vacant except for the greenhouses which, with their boiler plants and other improvements occupy 17 acres along the western boundary. The railroad that is said to "traverse" the property is actually its western boundary. A careful reading of the opinion shows that the surrounding area is conceded to be residential. The record shows that within a radius of 3500 feet from the center of this tract (and of course much closer to its borders) there are 1016 residential buildings.

It may be that a legislative body could reasonably decide that a portion of the tract near to the railroad and next to that part now used for greenhouses could properly be reclassified. But it is hard to believe that a responsible legislature would rezone the entire area so that factories would be placed in close proximity to the residences that have been built around its borders. It is even harder to believe that this court would sustain such a legislative rezoning if the question came before it.

The opinion reaches the result that it does by repeated characterization of the neighboring residences as "moderately priced." But the protection of zoning is not restricted to high priced property. (See *Kennedy* v. *City of Chicago,* 11 Ill.2d 302, 308.) The opinion does not mention the losses that the many owners of these moderately priced homes will suffer when factories, with facilities for parking 2900 cars, are put in their midst. Yet the testimony

of many witnesses was that the aggregate loss would total a minimum of $2,000,000.

It would be hard to find in Cook County any area nearly ½ a square mile whose borders do not lie close to some important highways. Yet the opinion reaches out to discuss the two toll roads that lie ¾ of a mile and more distant from this property. The influence of the airport upon the property is, in my opinion, exaggerated in the same fashion.

I think that in this case there has been a gross usurpation of the legislative function, and so I dissent.

DAVIS, C.J., and HERSHEY, J., join in this dissent.