La Salle National Bank, a National Banking Association, as Trustee Under the Provisions of a Trust Agreement Dated December 18, 1959, and Known as Trust No. 23824, and the American National Bank and Trust Company of Chicago, a National Banking Association, as Trustee Under the Trust Agreement Dated May 23, 1959, and Known as Trust No. 14490, Plaintiffs-Appellants, v. the County of Cook, a Body Politic and Corporate, Defendant-Appellee, and the Village of Lemont, Intervenor-Appellee.

Gen. No. 49,737.

First District, Third Division.

June 3, 1965.

Haskins, Maguire and Haskins, of Chicago (Robert E. Haskins and C. W. Eckert, of counsel), for appellants.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Edward J. Hladis, Chief of Civil Division, and Thomas A. Hett, Assistant State's Attorney, of counsel), for appellee; Stone, Epstein, Lynch and Fitzgerald, of Chicago (Bernard M. Epstein and Richard J. Fitzgerald, of counsel), for intervenor-appellee.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

This is an appeal from a judgment dismissing plaintiffs' claim for declaratory relief in a zoning case. Plaintiffs, as trustees of certain land trusts, are the owners of the property involved, which is located in an unincorporated area of Cook County near the Village of Lemont. The beneficial interests are apparently held by Arcole Midwest Corporation (Arcole), which desires to use the property for a quarry, one hundred feet deep and occupying forty-five acres of a fifty-six acre plot. The plot is zoned M–3, heavy industrial district. A quarry is a special use within that classifica-

tion, and a special permit from the Cook County Board of Commissioners is required for such use. The board refused to issue a permit, and plaintiffs brought this declaratory judgment action. The Village of Lemont was allowed to intervene as a defendant.

The principal issues are: (a) whether the requirement of a special use permit for a quarry in an M–3 manufacturing district is within the police power, it being contended by the plaintiffs that there is no legitimate reason therefor premised upon public health, safety, comfort, morals or the general welfare; (b) whether the standards relative to the granting of a special use permit have been met; and (c) whether the ordinance, as it applies to plaintiffs' property, is invalid because it amounts to a taking without adequate compensation.

The property consists of fifty-six acres, bisected in a generally northeast-southwest direction by a 150-foot wide public service right of way, and is located near the southwest corner of Bluff and Stephens Roads in Cook County. Bluff Road runs east and west and is the county line between Cook County and Du Page County to the north. There are about twenty-four homes located along that road, which will be separated from the subject property by a 266-foot wide strip of land which has been zoned M–1, or light manufacturing. Stephens Road runs in an approximately northwest to southeast direction. To the north of the intersection of Bluff and Stephens Roads there is an area in Du Page County which is zoned R–1, residential. There are homes in that area. To the northwest, about 1500 feet from the subject property, is the developing Santa Fe Railroad Co. Industrial Park. To the northeast is the Argonne National Laboratory. The proposed quarry is adjacent to Stephens Road on the east and is about one-fourth of a mile north of the village limits of Lemont. The Sanitary District Canal runs in a gen-

erally northeast-southwest direction just south of the property, as does the Du Page River and the tracks of the Santa Fe Railroad. Within the past five years, rock which had been left along the Sanitary Canal at the time it was built has been gradually removed and the area's capacity for industrial development has been enhanced.

To the east of Stephens Road, the only available road crossing the Sanitary Canal in the area, is a rock crushing plant. The president of Arcole testified that any rock quarried would be transferred by a conveyor belt under the Stephens Road Bridge over the Sanitary Canal, under the tracks of the Santa Fe Railroad trestle to the rock crushing plant. A defense witness estimated the cost of such conveyor belt at $300,000. The rock crushing plant is located on land owned by the Sanitary District. It was formerly leased to Arcole, but is now leased to Consumers Company (Consumers). Consumers has a contract with Arcole to process the rock quarried from the subject property. The contract has not been put in evidence, but the testimony of Arcole's president revealed that Arcole was to be paid a royalty of six cents a ton.

Further to the east of Stephens Road, on the edge of the Sanitary Canal, several barge slips are being constructed by the Lemont Industrial District, Inc. The construction involves the use of explosives and is similar to a quarry operation in that a temporary dam is used to hold back water of the Sanitary Canal while the slips are being quarried out of solid rock. The rock so quarried from the slips is transported to the same rock crushing plant which would crush the rock from the proposed quarry.

To the west of Stephens Road, between the Des Plaines River and the Sanitary Canal, is an asphalt plant, the Lemont Stone and Material Company plant and a concrete plant. South of the Canal at this point

is the Tri-Central Terminal with its storage tanks, and just to the west is the Ceco Steel Products plant.

The evidence reveals that the whole area around Lemont in the Des Plaines River Valley contains excellent Niagara dolomite limestone to great depths, with outcroppings that break the surface in several areas. This limestone is especially useful as a basis for concrete and as a base or bed for highway construction. In the immediate area are four flagstone quarries. These are "strip" operations which do not use explosives and in that respect they should be distinguished from plaintiffs' proposed type of quarry operation, which will use explosives. There are about eight abandoned quarries in the Lemont area. No new quarry has been planned or projected in that area in the last fifty years. The nearest operating quarries are in Hodgkins, Hillside, McCook, Thornton Township, and at 29th and Halsted Streets in Chicago.

Under the zoning ordinance in question any production, processing, cleaning, servicing, testing, repair or storage of materials, goods, or products which conform to certain performance standards and *which are not injurious or offensive to the occupants of adjacent premises* by reason of the omission or creation of noise, vibration, smoke, dust or other particular matter, toxic and noxious materials, odors, fire or explosive hazards or glare or heat, are allowed in an M–3 manufacturing district. Air, railroad, water freight terminals, railroad switching and classification yards and repair shops and roundhouses, among other things, are permitted in an M–3 heavy manufacturing district.

Certain types of usage, however, called special uses, which might come within an M–3 district classification, are subjected to the requirement that a special permit be obtained from the County Board. Such special uses include storage of flammable or explosive vapors or gases, garbage dumps, junk yards, and ex-

44

cavations of sand, gravel or raw material. Also included in that class of special uses, requiring prior examination and approval, are those involving the storage, utilization or manufacture of materials or products which decompose by detonation. It is admitted that a quarry falls within this last class of special uses.

The special use technique as a permissible method of land use regulation has been upheld against various claims of unconstitutionality. Kotrich v. County of DuPage, 19 Ill2d 181, 166 NE2d 601; Hartung v. Village of Skokie, 22 Ill2d 485, 177 NE2d 328; Columbus Park Congregation of Jehovah's Witnesses v. Board of Appeals, of City of Chicago, 25 Ill2d 65, 182 NE2d 722; Ward v. Village of Skokie, 26 Ill2d 415, 186 NE2d 529; Camboni's, Inc. v. DuPage County, 26 Ill2d 427, 187 NE2d 212; Frost v. Village of Glen Ellyn, 30 Ill2d 241, 195 NE2d 616.

The court in the Kotrich case, supra, said that the special use technique was developed as a means of providing for types of land use which are necessary and desirable but which are potentially incompatible with the uses usually allowed in residential, commercial and industrial zones; that such uses generally occupy rather large tracts of land, and that they cannot be categorized in any given use zone without the danger of excluding beneficial uses or including dangerous ones. Instead of excluding such uses from certain zones entirely, they are included as a special use, because there may be circumstances under which the public body charged with that duty may conclude that the benefits to be derived will offset the potential harm, and conditions with respect thereto are provided.

■■ Plaintiffs argue that the county zoning ordinance requiring a special use permit is unconstitutional because there is no sound reason premised upon public

45

health, safety, comfort, morals or the general welfare requiring a special use permit for a quarry operation in an M–3, heavy industrial zoning district. It appears to us, however, that there is a rational basis for distinguishing between a quarry *using explosives* and the other permitted uses in such district. The court in Peet v. Dolese & Shepard Co., 41 Ill App2d 358, 190 NE2d 613, said, p 368:

> "[I]t is a matter of common knowledge that the use of dynamite as an explosive is intrinsically dangerous; this includes consequential injury resulting from an explosion by reason of concussion or vibration, as well as an injury resulting from rock or debris, etc. . . ."

Plaintiffs contend that the practical effect of the zoning ordinance is to exclude quarries from Cook County, and that the ordinance is therefore invalid because it prohibits a legitimate business. This argument is based on the assumption that there is insufficient land in the M–3 classification in Cook County which could be used as a quarry. The evidence does not warrant such assumption. It reveals that there are several existing quarries in Cook County. The same argument was made and rejected in Camboni's, Inc. v. County of DuPage, 26 Ill2d 427, 187 NE2d 212, where the plaintiff argued that the placing of trailer parks as a special use in a B–4 commercial area of DuPage County had the practical effect of excluding trailer parks from the county.

Plaintiffs argue that the standards set forth in the county zoning ordinance relative to the granting of a special use permit under the circumstances of the instant case have been met, and that the County Board's refusal to issue the permit was arbitrary and capricious. There is no doubt that a quarry is a useful enterprise, Herman v. Village of Hillside, 15 Ill2d 396,

155 NE2d 47, and if it conforms to the standards enumerated, the permit should issue. The standards are as follows: (1) that the establishment, maintenance or operation of the special use will not be detrimental to or endanger the public health, safety, morals, comfort or general welfare; (2) that the special use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted nor substantially diminish and impair property values within the neighborhood; (3) that the establishment of the special use will not impede the normal and orderly development and improvement of the surrounding property for uses permitted in the district; (4) that adequate utilities, access roads, drainage and/or other facilities have been or are being provided; (5) that adequate measures have been or will be taken to provide ingress and egress so designed as to minimize traffic congestion in the public streets; and (6) that the special use shall in all other respects conform to the applicable regulations of the district in which it is located, except as such regulations may in each instance be modified by the Board of Commissioners pursuant to recommendation of the Zoning Board of Appeals.

The first three standards are interrelated and will be considered together. Witnesses for plaintiffs testified that the noise and vibration generally associated with quarry explosions can be controlled within the performance standards for such phenomena in M–3 districts. The Argonne National Laboratory was consulted and did not object. The undisputed testimony of defendant's witnesses showed however that private wells in the immediate area belonging to residences along Bluff Road would be damaged by vibrations caused by detonations; that blasting would crack and damage any grout—a cement film or sealer—placed around the walls of the quarry to prevent seepage,

and as a consequence water would seep into the quarry, because as the quarry went below the water table in the area, that table would drop, causing the water level in the private wells to drop. In some instances, the wells would go dry. The Chief Sanitary Engineer of the DuPage County Health Department testified that a quarry raised the danger of well pollution; that while chlorination would prevent most forms of pollution, it would not prevent virus and amoebic dysentery. Defendant's experts in well drilling and water purity testified that the 266-foot buffer zone of M–1 light industry between the proposed quarry hole and Bluff Road was insufficient to prevent possible pollution and water loss.

The Police and Fire Chiefs of the Village of Lemont both testified to the attractive nuisance factor of an operating quarry, its attraction as a gathering place for car stripping and for undesirable persons who would pass through the village on their way to and from the quarry, and its very dangerous qualities when abandoned. They recalled several drownings at nearby abandoned quarries in the Lemont area and testified that within their memory no quarry had been started in the area.

George Kranenberg, a well known zoning and planning expert, Deputy Director of the Chicago Planning Commission, and technical expert of the staff which prepared Cook County's 1960 Comprehensive Zoning Amendment, testified that he was familiar with the area and that the proposed site was too small to afford proper protection for quarry use and that it could create dangers to the health and safety of people living in adjacent residential areas. The eventual water hole would constitute a hazard for children.

There is conflict in the testimony as to whether the operation of the quarry would impair property values in the area. The defendant's witnesses, as hereinbe-

fore set forth, testified that water wells would be affected. A Lemont real estate appraiser testified that an operating quarry would reduce the value of the surrounding residential property along Bluff Road, directly facing the subject property, somewhere between sixty and seventy percent. Residences in DuPage County to the north of the site would also be reduced in value depending on their distance from the site. Another real estate appraiser testified that nearby property of a residential and industrial character would be depreciated from $100,000 to $150,000, that there would be a loss of potential tax revenue by discouraging industrial development in the area, and that the quarry itself could not be taxed on the same basis as an alternative industrial site, because no building would be erected on the premises. The only contrary testimony was that of William S. Lawrence, a planning and zoning consultant, who said the residences on Bluff Road directly facing the quarry would be only remotely affected. He also testified that a quarry hole would not adversely affect industrial property values.

Lawrence also testified for plaintiffs that a quarry would not deter future industrial development of the area. This was controverted by Kranenberg, defendant's expert hereinbefore mentioned, who was of the opinion that industrial development within the standards of M–3 districts generally would be deterred. George Becker, one of the defendant's real estate appraisers, who has appraised all types of residential, commercial and industrial properties since 1932, agreed with Kranenberg that industry would be deterred not only because of the quarry as such, but because the tax assessment base which a quarry would produce being lower than a normal industrial operation, it would place more of the tax burden on the other properties.

James O'Connell, a real estate broker doing business in Lemont, who sold several millions of dollars of in-

dustrial commercial and residential property in the area, told of the impetus to industrial development within the last five years due to removal of rock which had been left along the banks of the canal since it was constructed. He described the Santa Fe Railroad Company's Industrial Park, not 1500 feet northwest of the subject property, and catalogued the excellent facilities of the area for industrial development in terms of* motor, rail and water transportation and the availability of gas and electricity, and it was his opinion that the dirt, dust and psychological effect of a quarry would devalue the adjacent property for industry and would impede industrial development.

The fourth and fifth standards require that utilities, access roads, drainage and other facilities be provided and that adequate ingress and egress to the site be arranged so as to minimize traffic congestion in the public streets. The question of the adequacy of the roads, especially the Stephens Road Bridge, a narrow two-lane road and the only southern route from the quarry site, was challenged, but upon assertion that the stone would not be trucked but would be transported by conveyor belt to a stone crusher leased to the Consumers Company near the Sanitary Canal more than a mile away, that objection was minimized.

The sixth and last standard was that plaintiffs meet certain performance standards for an M–3 district with respect to noise, vibration, smoke, toxic matters, noxious and odorous matters, fire and explosive matters, and glare and heat. As hereinbefore mentioned, witnesses for plaintiffs testified that the noise and vibration generally associated with quarry explosions can be controlled within the performance standards for such phenomena in an M–3 district. Except for the testimony about well pollution, little testimony was introduced on the other standards. Defendant has not argued that the plaintiffs cannot meet those standards,

but urges rather that it is impossible at this time to determine whether the plaintiffs will comply.

■ It is undisputed that the trend in the area is toward industrial development, and the evidence supports defendant's contention that both residential and industrial property values would suffer by the operation of a quarry. The prospect of pollution of wells, the harmful effects of the quarry in terms of its general noise, dirt and its attractive nuisance qualities make the decision of the County Board reasonable.

■ As a final attack upon the judgment order, plaintiffs argue that the county zoning ordinance, as it applies to plaintiffs' property, is invalid because it amounts to a taking without adequate compensation. A zoning ordinance is presumptively valid, and this presumption may be overcome only by clear and convincing evidence. The burden of proof is on the plaintiffs. The validity of each zoning ordinance must be determined on the facts applicable to the particular case, but certain general lines of inquiry have been regarded as relevant, to wit: (1) existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the destruction of property values of the plaintiffs promotes the health, safety, morals or general welfare of the public; (4) the relative gain to the public, as compared to the hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes; and (6) the length of time the property has been vacant as zoned, considered in the context of land development in the area in the vicinity of the property. LaSalle National Bank of Chicago v. County of Cook, 12 Ill2d 40, 145 NE2d 65.

■ The fact that plaintiffs may suffer a loss in value is not sufficient to establish invalidity. It must also be shown that the public welfare does not require

the restriction and resulting loss. All these factors, with the exception of the loss to the plaintiffs if they are not allowed to build a quarry, have been considered in our discussion of plaintiffs' argument with respect to the alleged arbitrary action of the County Board. We will proceed to a consideration of plaintiffs' alleged loss.

On this point the evidence is conflicting. The issue turns partially on whether a primary rock crushing plant should be constructed on the premises. This would reduce the total acreage to be quarried. The depth of quarriable rock and the amount of removable rock, even assuming depth and acreage, are also in dispute. These factors determine the life of a quarry, because the parties have assumed that a constant 300,-000 tons of rock a year will be quarried, which is the capacity of the plant leased to Consumers where the rock will be crushed.

The value of the land is determined by the present value of plaintiffs' right to receive royalty payments based on six cents a ton, as testified to by the president of Arcole, for the life of the quarry. Arcole, as owner, receives the royalty for the use of the land. The cost of quarrying the rock and market conditions are factors which will determine Consumers' profit or loss, but not the present value of the land, except as the business relationship between the companies might cause them to agree to a change in the royalty. The parties differ on the proper method of capitalizing annual royalties. Three methods were used: the Inwood, the Hoskold, and the straight line. These are highly technical methods and it would serve no useful purpose to go into detailed explanation of their differences. Each has substantial support. It is sufficient to note that plaintiffs' expert saw fit to use the Inwood method, which would give a greater present value to the property than either the Hoskold method

or the more conservative straight line method favored by defendant's witnesses. The parties also disagreed as to the proper interest or risk rate to be used in capitalizing future royalty payments. There is ample evidence to support defendant's position.

Harry Shlaes, a real estate appraiser with eminent qualifications, testified for plaintiffs that the property was worth only $169,250 for industrial purposes and $246,313 as a quarry. This estimate was based on a full 45-acre plot excavated to a depth of one hundred feet. He felt that 16,158,000 tons of removable rock was present and on the assumption the quarry could be mined at the rate of 300,000 tons a year, it could be emptied in approximately fifty-four years. Shlaes assumed the six cent royalty figure and used the 7% Inwood method of capitalization. John Kilman, a geologist hired by plaintiffs, examined the core samples taken from the quarry and said there was limestone rock to the depth of one hundred feet.

John Meissner, a professional engineer with fifty years experience, twenty to twenty-five years of which involved quarrying, testified for defendant that he was of the opinion that a pit to one hundred feet covering forty-five acres would produce only 12,600,000 tons of removable rock; that a primary crushing plant would be necessary and that this would reduce the removable rock in the pit to 11,700,000 tons. He said that a shale intrusion at sixty feet made quarrying beyond that depth commercially unsound. The logs of the core samples show definitely there is an intrusion of shale at sixty feet. Based upon a depth of sixty feet, he felt there would be only 7,500,000 tons of removable rock without the crusher plant and 7,000,000 with such a crusher.

George Becker and Richard Nelson, two well qualified appraisers, testified for defendant. They agreed with Meissner's estimate of quarriable rock. They dif-

fered with Shlaes' method of capitalization, in that Becker preferred either the Hoskold method or the straight line method of capitalization, while Nelson preferred the straight line method. Nelson and Becker both assumed a six cent royalty a ton, a 300,000 ton a year output, and came to the conclusion that even using Shlaes' estimate of one hundred feet of limestone, the full forty-five acres, and 16,500,000 tons of quarriable rock, the value of the property would be $179,700 (straight line) and $207,740 (Hoskold); and that using Meissner's estimates and assuming a one hundred foot pit, Becker valued the property at between $163,780 (straight line) and $190,670 (Hoskold); while assuming a sixty foot pit because of the shale and allowing for a primary crushing plant, Becker estimated the value at between $137,760 (straight line) and $163,460 (Hoskold). Nelson, also using Meissner's computations of quarriable rock, was of the opinion the value of the quarry was $155,523 (straight line) if the pit were one hundred feet deep without a crushing plant, and if sixty feet were the maximum depth and a crushing plant was also constructed, the value of the quarry would be $132,605.

Using Shlaes' computation, which is most favorable to plaintiffs, there would be a loss of $80,000 to the owners because of the refusal to grant the special use ($250,000 value as a quarry less $170,000 value as industrial property). Defendant's real estate appraiser who sold several millions of dollars of property in the Lemont area valued the property at $230,000 for industrial purposes. Shlaes testified in rebuttal that this figure did not include the cost of preparing the land for industrial purposes, which would mean basically providing for waste disposal, and that when such cost was taken into account, the property was worth about $170,000. It is undisputed, however, that Shlaes relied on the owners' representation that the full forty-

five acres would be mined and that the pit would be one hundred feet deep. He did not express an opinion as to whether the pit could be quarried at one hundred or at sixty feet or whether a primary crushing plant was necessary.

█ The parties have assumed that rock would be taken from the quarry at the rate of 300,000 tons a year and that thus, on the basis of 16,158,000 tons, the quarry would be emptied in fifty-four years. That it will take out 300,000 tons a year over such a long period is problematical. The valuation of a quarry, more than the valuation of other real estate, depends on events over a long period of time. Testimony that the area is generally industrial and that qualified real estate appraisers are of the opinion that the land is worth anywhere from $207,000 at the most to $155,000 at the least, *for industrial purposes,* combined with the other factors, makes it clear that plaintiffs have not shown that their property will be taken without just compensation.

Taking into account all the uncertain factors involved in the future of this property and of the community, we are satisfied that the trial court acted properly in dismissing the plaintiffs' claim for declaratory relief.

Judgment affirmed.

DEMPSEY, P. J. and SULLIVAN, J., concur.