(No. 34760.—

KATHRYN HERMAN *et al.,* Appellees, *vs.* THE VILLAGE OF HILLSIDE, Appellant.

*Opinion filed November 26, 1958—Rehearing denied Jan. 22, 1959.*

SULLIVAN, JEFFERS & DOHENY, JOHN J. DILLON, AL-
BERT J. JANTORNI, WINSTON, STRAWN, SMITH & PATTER-
SON, LOUIS ANCEL, and McMAHON & PLUNKETT, all of

Chicago (James J. Doheny, Arthur D. Welton, Jr., Edward J. Wendrow, Edward L. Foote, and George H. Masek, of counsel,) for appellant.

MacLeish, Spray, Price & Underwood, and Francis X. Cuisinier, both of Chicago, (Joseph W. Townsend, and Joseph H. Morency, Jr., of counsel,) for appellees.

Mr. Justice House delivered the opinion of the court:

A declaratory judgment action was filed against the village of Hillside by Kathryn Herman and other individual members of the Holland family as the fee owners of a tract within the limits of the village, and joined by a corporate plaintiff, Vulcan Materials Company, successor after the trial to the leasehold interest of the original corporate plaintiff. They seek to have the 1948 zoning ordinance of the village, as amended, declared invalid as to the property owned by the individual plaintiffs, and a declaration that the lessee has the right to use the property for quarry purposes. The master's report, to which objections were filed, was approved and a decree was entered by the circuit court of Cook County declaring the ordinance invalid and void as applied to the property. The decree is appealed directly to this court since the trial judge certified that in his opinion the public interest so requires.

The individual plaintiffs are the owners of a 40-acre tract, except for a small portion taken off the southwest side for the Congress Street Expressway, which has been in their family since shortly after the Civil War. There is located upon the land a deposit of dolomite, a high medium magnesium carbonate, commonly known as limestone, in excess of 280 feet thick. It is quarriable, is used primarily for building and road construction, and meets the specifications for coarse aggregate of the Illinois State Highway Department.

Quarrying operations were commenced on the tract many years ago by the grandfather of the individual plaintiffs, and have been continued on a much larger scale by the present quarry company and its predecessors since 1929 on a semicircular 8½-acre tract off the east side thereof. The quarry company had attempted to acquire the remainder of the tract, consisting of 23.59 acres, either by purchase or lease, for many years dating back as early as 1934. The Holland family would not consider leasing the tract in controversy during the lifetime of the individual plaintiffs' mother who lived in the old homestead thereon. It was otherwise practically vacant and unimproved, except that the westerly 22 acres had been used as a golf course for a period ending in 1945. After the mother's death in 1953 negotiations were revived and resulted in a long-term lease between the individual owners and the quarry company. The latter owned a 39-acre tract east of and adjacent to the Holland tract, and a 43-acre tract lying immediately south of the 39 acres. Extensive quarrying operations have been conducted for many years on the 39-acre tract and on the northerly portion of the 43-acre tract, in addition to the 8½ acres leased from the Hollands. A substantial part of the 43-acre tract has been condemned and is being incorporated in the Congress Street Expressway which runs roughly from northwest to southeast, cuts off the southwest corner of the Holland tract and runs just south of the south line of the 39 acres, but takes in the southeast corner of the 39-acre tract for an interchange.

The present quarry consists of a quarry hole or pit 250 feet deep at its deepest point. Offices, shops, crushers, conveyors, elevators, a ready-mix plant and other equipment usually associated with a large quarry operation are located on the east side of the 39-acre tract. Stock piles are maintained to a height of 35 or 40 feet along the railroad siding which skirts the east boundary of the 39-acre tract, and contain crushed stone in 8 or 9 sizes from ³⁄₁₆″ up. The stone

from all three of the tracts is processed and stored on the east end of the 39 acres.

The subject tract is bounded by Harrison Street and Congress Street Expressway on the south, and Forest Avenue on the west. A strip of vacant land lies immediately north of it, the plant of the Aluminum Company of America, is upon the land next north, which in turn is bounded on the north by Madison Street. Mannheim Road runs along the east side of the 39-acre quarry tract.

The village of Hillside adopted its general zoning ordinance in 1948. That part of the Holland property lying west of a north-south line drawn approximately 50 to 60 feet west of the most westerly part of the area being actively used for quarrying at that time was zoned residential. The 39-acre tract, and that portion east of the line were zoned "C" industrial, which permitted quarrying. The quarry company was granted a certificate of nonconforming use as to the 43-acre tract prior to its condemnation for the expressway. The strip lying immediately north of the Holland and quarry company property was zoned "A" industrial, for light manufacturing use, while the Aluminum Company's strip was zoned "B" industrial, for heavy industrial use. Under the original ordinance all the land lying west of Forest Avenue extended, between Harrison and Madison streets, and that lying south of Harrison was zoned residential.

In January 1953, the ordinance was amended to create a "B-1" business zone. All of the tract west of the subject property between Forest Avenue on the east and Wolf Road on the west, a distance of about ½ mile, was classified to permit the construction of a large shopping center comprising 60 retail stores built around the Carson, Pirie, Scott & Co. establishment, and a parking lot. Approximately the southwest half is now occupied by the shopping center and the northeast half lying north of the expressway is used as a 5,000 automobile parking lot for the shopping

center. During the pendency of these proceedings before the master, the subject property was reclassified for light manufacturing use and that is its present classification. In addition to those heretofore noted, the adjacent land uses consist of a single-family residential area to the northwest of the Holland tract most of which has been built since 1948, an older residential section lying south of the Holland property and south of the expressway. Tracks of the Illinois Central railroad roughly parallel the expressway approximately 500 feet south therefrom. A greenhouse lies in the triangle of the tracks bounded on the north by Harrison Street and on the east by Forest Avenue extended from the southwest corner of the Holland land. The greenhouse separates the subject property from the new $7,000,000 high school being constructed on a 65-acre tract to the southwest. The southwest corner of the Holland tract is 2,000 feet from the closest school building and 1,100 feet from the closest corner of the school's athletic field. To the east of the 39-acre tract there is a built-up residential area in the village of Bellwood and just south of that another residential area in the village of Westchester.

Plaintiffs take the position that the village may not arbitrarily deprive them of a normal and lawful use of their property where the disadvantage to the public is inconsequential and the effect upon the owners is confiscatory. The village contends that zoning of the subject tract to light industrial use which would prevent the extension of quarrying operations is proper, particularly when the quarrying operation is a nuisance in fact.

The testimony is voluminous. Eighteen witnesses from the villages of Bellwood and Hillside testified. Those living in Bellwood were closest to the east or processing end of the quarry company's operation and they expressed annoyance and discomfort caused by blasting manifesting itself in the form of noise, concussion, vibration and dust blowing on their premises from the stock piles. The Hillside resi-

dents who are farther from the processing operation made similar complaints except that they did not complain of dust deposits since the prevailing wind is toward the quarry. The blasts from dynamiting were variously referred to as being strong enough to crack foundations, down to strong vibrations and tremors. Plaintiffs furnished much scientific testimony relative to the methods used to minimize the effect of blasting and gave accurate measurement showing that the sounds arising from the quarrying operations were not greater than traffic and other noises customary in urban areas. An air-pollution expert, after taking measurements extending over a period of 12 days, concluded that the dust fall is less than that expected in an industrial area and below that usually found in the suburbs of a large city. An examination of all the evidence leads to the conclusion that the quarry is an unsightly operation which is distasteful to residents in the immediate area. The noise and tremors from blasting and the dust blowing from the stockpiles onto their premises undoubtedly annoy some residents. The record does not bear out the statement of some of the witnesses that structures are damaged by the blasts to any appreciable degree and the cases of flying debris are limited. In any event, this is not a nuisance case, and we must view it from the principles applicable to zoning.

There is, of course, a presumption of validity in favor of a zoning ordinance and the burden of proof is upon one who challenges the validity of such an ordinance as applied to his property and he must prove by clear and convincing evidence that such ordinance is arbitrary and unreasonable and without substantial relation to the public health, safety, morals or general welfare. (*La Salle Nat. Bank* v. *City of Chicago,* 4 Ill.2d 253; *Skrysak* v. *Village of Mount Prospect,* 13 Ill.2d 329.) Various factors must be taken into consideration including existing uses and zoning of nearby property, the amount by which property values are decreased, the extent to which diminution of value promotes

the health, safety, morals or welfare of the public, the relative gain to the public as compared to the hardship imposed upon the individual, the suitability of the property for the purpose for which it is zoned, and many others. *Myers* v. *City of Elmhurst*, 12 Ill.2d 537; *La Salle Nat. Bank* v. *County of Cook*, 12 Ill.2d 40.

We first consider the factor of the gain to the public by the zoning of the subject property to prevent an extension of the quarrying operations, the public in this sense being the owners of property on the periphery of the tract in question and, to a progressively lesser extent, those beyond, up to a mile or more.

Obviously the quarry to the east will suffer no loss by the extension of its operation. Residents of Bellwood and Westchester next east will not be affected any more adversely by the extension of operations than they are by the present quarrying. The processing equipment and stock piles are located closest to them and will be used in the same manner as at present. Noises and vibration from blasting will decrease as the face is moved farther west. The property north of both the Holland tract and the quarry 39 acres is zoned industrial as is the aluminum company property to the north and the latter is occupied by an industrial plant. Nothing in the record indicates any loss to those owners by the proposed extension. The Congress Street Expressway, which appears by a scale on the exhibit to be about 400 feet wide, separates the residential area to the south from the subject tract. Except for the dwellings on the west side, they will be almost as close to the quarrying operations if extended as they are to the present face where the blasting occurs. It would seem that the expressway will insulate them from the noise, particularly in view of the added noise of the busy expressway. The same applies largely to the school, with the added factor of distance.

While the shopping center tract abuts on the Holland property, the exhibits disclose that the expressway separates

completely the subject tract and the shopping center proper. The latter runs to a point and its principal buildings are all on the west one-half, the nearest being at least ¼ mile away. Good planning is indicated by the placing of the parking lot between the existing quarry and the actual shopping center. The record does not show that the extension of the quarry will affect the center to any appreciable degree.

This brings us to the residential section cornering the Holland tract on the northwest, which would be the area most affected by an extension of quarrying. Nine witnesses from that section testified, five of whom were men and four were housewives. The men, who are home only occasionally during the blasting periods of the day, were in agreement in varying degrees that tremors and vibrations could be felt. One stated that the first time he heard a blast "it seemed to me as if someone had dropped a piano" and his wife told him "it was just the quarry"; another said his house shook and his foundation has cracks from the blasts; still another likened the tremors to an earthquake; a fourth testified that it caused a sensation of trembling throughout his body; and a fifth stated the first blast he heard was not bad but the second caused a picture to turn sideways, the house to tremble or shake and that he "jumped a foot." We have scrutinized carefully the testimony of the housewives, since they are at home more and have experienced the effects of the blasting over a period of time. Each of them had carried petitions against rezoning the subject property from A residential to C industrial, such petitions having been signed by 1340 residents of Hillside. Mrs. Mayer testified that she had noticed nothing in recent years but that she had a plate crack on the top of a stack of dishes the first year they moved into the district following a blast. She expressed the opinion that extension would be detrimental to the village as a whole, that it would decrease the value of property and that the quarry is un-

sightly. Mrs. Stasch stated that she did not like the quarry extension, that it was "not very nice" and that "they are called Quarry Town." Mrs. Kilgore objected because her children were awakened and she did not like the sight of it stating "its kind of dirty over there." Mrs. Lyonstein's reaction was that the quarry is an eyesore, the noise and rattle make homes move and lowers property values.

The people who built residences to the northwest, most of whom built since 1948, have little room for complaint. Their homes were built in the face of an existing outcropping limestone deposit which has been exploited in varying degrees of intensity for many years and in the face of the fact that the Holland property was a single tract as to fee ownership, with the portion now in question separated from the remainder only by an invisible zoning line. It is argued that these persons had the right to rely upon the residential classification given to that part of the Holland property not presently being quarried. This argument cannot be reconciled with the action of the village in reclassifying the property from residential to light industrial during the pendency of this suit. It would seem that the village authorities recognized the incongruity of the residential classification which would place a residential section on the brink of a 250 foot pit, and sought to strengthen their position by reclassification of a use less restricted but short of permitting quarrying.

The second part of defendant's argument is grounded upon the theory that the residents of this particular section (and those in other parts of the area to a greater degree) had every reason to look forward to a cessation of quarrying when the 8½-acre portion had been excavated, while the extension of operations to the subject tract would cause the continuation of quarrying for another 25 years. This argument is not impressive. The quarry company had 43 acres adjoining its 39-acre tract. Presumably the time required for removal and processing of 43 acres of stone

would have been almost double the time required to quarry the subject tract because of the difference in acreage involved.

We next consider the factor of the loss to the owners and lessee if the present zoning classification prevails. Two appraisers testified for plaintiffs and valued the subject tract in excess of $700,000 for quarrying. One of them appraised it at $9,000 per acre or $212,300 for industrial use other than quarrying while the defendant's appraiser fixed a value of $19,000 an acre or $437,000 for the industrial purposes for which it is zoned. The method of valuation by plaintiffs' witnesses is severely criticized but no evidence was offered to contradict it. It would serve no useful purpose to go into the technical evidence used in arriving at the value since the record establishes, by competent, credible evidence, that the highest and best use of the tract is for quarrying and that the loss to the owners will be substantial if they are prevented from using the Holland tract for quarrying.

The record further indicates that to replace the quarry plant would cost from three and one-half to five million dollars, exclusive of land. Defendant challenges plaintiffs' statement that the physical plant will become obsolete and valueless for want of raw materials. It is impossible to determine the exact amount of loss to the quarry company if it runs out of raw material and undoubtedly there would be some salvage. In any event, again the loss would be substantial.

In addition to the factor of the loss to the owners, there must also be taken into consideration the loss to the public generally. This quarry furnishes large quantities of stone used in the construction of buildings and as coarse aggregate for highways. The close proximity of the quarry to the urban area of Chicago to the east and to the fast-growing communities to the north, is advantageous to the building public. Limestone is a heavy, bulky product and

it is a matter of common knowledge that the greatest part of the cost is the transportation of same over long distances.

The defendant argues that limestone is under the entire area, which may be true, but according to the competent evidence in the record, the outcroppings of limestone with an overburden as thin as that of subject property are presently being quarried. Just as cost to the consumer increases with the distance of the haul, so the increase in thickness of overburden increases the cost of quarrying and removal with a consequent increase in cost to the consumer. There is a distinct advantage particularly to those in the immediate area, in having a supply of building stone available.

We have often said that the facts in each particular case must be taken into consideration in applying the well-known rules of the zoning law. After a consideration of all of the factors here involved, including the single ownership of the fee of this land which has been used for quarrying for a great number of years, the existence of the present quarry, the availability of a natural resource, the use of part of the present property and adjacent property for quarrying over long periods of time, the severe loss to both the fee owners and the lessee as compared to the relatively small increase in inconvenience to owners in the neighborhood, we are of the opinion that the classification is unreasonable. This is particularly true since most of the residential construction in the area has been done with the full knowledge of the existing quarry, and there is no substantial proof that the proposed extension will materially affect the owners. We are further of the opinion that the reasonableness of the present zoning restriction is not fairly debatable and that the plaintiffs have sustained the burden of establishing the arbitrary character of the restriction. *Midland Electric Coal Corp. v. County of Knox,* 1 Ill.2d 200; *La Salle Nat. Bank v. County of Cook,* 12 Ill.2d 40.

Lastly, defendant contends that plaintiffs failed to exhaust their administrative remedies by seeking a variation

from the board of appeals and then obtaining a review of an adverse decision under the Administrative Review Act. This contention is based upon our holdings in *Bright* v. *City of Evanston,* 10 Ill.2d 178, and *Bank of Lyons* v. *County of Cook,* 13 Ill.2d 493. The reason for the rule set out in those cases is to give the municipal authorities an opportunity to correct invalid regulation before becoming involved in litigation. They are distinguishable from the case before us in that ample opportunity was given the village. Plaintiff filed an application for amendment of the zoning ordinance requesting reclassification, public hearing was had before the board of appeals and the corporate authorities adopted a resolution refusing to amend. The same board of appeals would have had jurisdiction over a variation, and it is unreasonable to assume that it would reverse itself and grant practically the same relief. To insist on the additional useless step would merely give lip service to a technicality and thereby increase costs and delay the administration of justice, which is the very thing we are trying to avoid. The action here taken was a reasonable equivalent within the meaning and spirit of the cases above cited.

We find no error in the judgment of the circuit court of Cook County and it is, accordingly, affirmed.

*Judgment affirmed.*