Mid-West Emery Freight System, Inc., a Corporation, and Aid Association for Lutherans, Appleton, Wisconsin, Plaintiffs-Appellees, v. City of Chicago, a Municipal Corporation, Defendant-Appellant.

Gen. No. 51,823.

First District.

January 23, 1970.

Rehearing denied March 19, 1970.

Raymond F. Simon, Corporation Counsel of City of Chicago (Marvin E. Aspen and Edmund Hatfield, Assistant Corporation Counsel, of counsel), for appellant.

Haskins, Maguire & Haskins, of Chicago (Robert E. Haskins and C. W. Eckert, of counsel), for Mid-West Emery Freight System, Inc., plaintiff-appellee.

MORAN, P. J.

Plaintiffs filed a declaratory judgment action to change the zoning classification of plaintiffs' property from its present M1–1 Restricted Manufacturing classification to a C4 Motor Freight Terminal District, so as to permit the building of a refrigerated storage plant with loading docks. Fifty-four adjacent single-family residential owners were granted leave to intervene. The trial court entered judgment for the plaintiffs, finding that the existing zoning classification unreasonably restricted plaintiffs in the use of their property and was, therefore, void and unenforceable insofar as it prohibited plaintiffs from proceeding with their plans. The city appeals.

The subject property, an irregularly shaped area of approximately fourteen and one-half acres, is located at the southwest corner of 70th Street and Pulaski Road. On the north it extends west along 70th Street, which ends one block west of Pulaski, then further due west to a point 725 feet west of Pulaski. Including some unimproved land at the west end of the lot, the depth of the lot at its deepest is 936 feet from Pulaski. On its eastern boundary it extends two blocks north and south along the west side of Pulaski Road, past 70th Place, which ends on the east side of Pulaski, to a point opposite 71st Street which also ends on the east side of Pulaski. From this point, the southern boundary runs west to the easterly right-of-way of the Belt Line Railroad, and then along the right-of-way, in a northwesterly direction through unimproved land to the northwest corner of the property described above.

The eastern portion of the property is improved with a one-story brick office and garage-type building, approximately 125 × 200 feet. The western portion is raw land and is the area sought to be improved. All but the extreme western portion is enclosed with a six-foot high cyclone fence.

Immediately to the north of the subject property is an area zoned R2 Single-Family Residence, but the frontage along Pulaski is zoned C1–1 Restricted Commercial. This is a well-developed residential area and extends from Mid-West Emery's plant to 63rd Street on the north and from Pulaski on the east to Cicero on the west. The south boundary of this residential development is irregular due to the northwesterly curve in the Belt Line Railroad, and the industry located along its right-of-way. The most immediately affected residences are located in a three-block area between 69th and 70th Streets and from the alley west of Pulaski, across Komensky and Karlov, to Kedvale, three blocks to the west. These are lightly traveled residential streets; however, Pulaski is a heavily traveled, four-lane through street. One twelve-hour traffic count exceeded 22,000 vehicles. This area was first subdivided in 1916, but failed to develop until after World War II. Until 1941 there were only five frame houses in the area. At that time the area was rezoned from manufacturing to residential and has since developed completely with single-family brick houses ranging in value from $18,000 to $20,000. The business properties along this area on the west side of Pulaski, 70th Street to 69th Street, include a parking lot and two-story office building, both owned by Mid-West Emery, a single home and an automobile body shop.

On the east side of Pulaski, beginning at 69th Street and going south to 70th Street, there is a drive-in restaurant, gas station, vacant lot and office building. Continuing from 70th Street to 70th Place, there are three buildings now owned and used by Mid-West. These buildings on the east side of Pulaski are in a B4–2 Restricted Service District, while those on the west side are in C1–1 Restricted Commercial District. South of 70th Place the frontage along Pulaski is vacant to the

430

overpass which is just beyond 71st Street. Across the overpass is J. L. Trucking warehouse facility and Robinson Steel Company, but these uses cannot be seen from Mid-West Emery's location. The area to the east of the frontage just described is zoned R2 and R3 from 63rd Street on the north to 71st Street on the south and is a homogeneous residential community built around Marquette Park.

Immediately south of the subject property, contiguous with Pulaski and the Belt Line right-of-way, is a catalyst plant of the Nalco Chemical Company. This is a heavy industrial use which is zoned M2–2 General Manufacturing District.

West and southwest of the subject property and Nalco, across the Belt Line tracks and freight yards is the expansive Ford City Development which extends to 77th Street on the south and from Pulaski to Cicero on the west. Ford City encompasses a shopping center, industrial park and freight terminal uses, zoned B5–2, M1–1, M2–2 and C4, respectively. The area zoned C4 for motor freight terminals has been expanded periodically so that the east edge of that C4 district is only several hundred feet across the tracks from the west edge of Mid-West Emery's plant. The entrances to these operations are a mile apart, however.

Abutting plaintiff's property on the west, there is an alkali plant with track spur and trucking facilities in an M1–1 district which is apparently in compliance with that classification. It is a lighter manufacturing use than the Nalco Chemical plant to the south of the subject property and is adjacent to the residential area first described.

Mid-West Emery is an interstate motor freight carrier operating between Denver and the east coast. It maintains several terminals throughout this area, and has four facilities in the Chicago area, including the subject

431

property. It owns about 325 tractors and 650 trailers, and its net income for 1964 was approximately $4,000,-000. Sixty percent of its operation is carrying meat.

At present Mid-West Emery employs approximately 190 drivers and 50 mechanics at the Pulaski location. Sixty to seventy tractors and trailers enter or leave the facility each day. Approximately 150 trailers and 100 tractors are parked there over the weekend, as well as the junk equipment stacked behind the garage. In addition, about 100 cars belonging to employees are parked on the premises each day. The garage is open 24 hours a day, and 20% to 25% of the traffic in and out is after 6:00 p. m.

The operation is primarily involved with service and maintenance of equipment, including painting. There are no docking facilities or storage areas on the premises, only the office building and garage. Each trailer hauling perishable goods has a separate refrigeration unit. No transfer of freight [1] is made there unless it is necessary to make repairs. The trailers are loaded elsewhere and come into the plant to receive billing, manifesting

[1] Motor freight terminal is defined by the 1957 Chicago Zoning Ordinance as:

"A 'motor freight terminal' is a building or area in which freight brought by motor truck is assembled and/or stored for routing in intrastate and interstate shipment by motor truck."

Such motor freight terminals are placed by the 1957 Zoning Ordinance in a separate, distinct classification, denominated C4 Motor Freight Terminal District, as stated by the Ordinance:

"The C4 Motor Freight Terminal District is designed to accommodate large-scale trucking terminal operations involving interstate and intrastate motor carriers, which activities are incompatible with the great majority of other land uses and so are more suitably placed in a special zoning district mapped in strategic locations for efficient coordination with the city's planned street and thoroughfare system."

and paper work. The open area is also used for parking the equipment. The operation has been essentially the same since Mid-West Emery came there in 1952. Apparently, the property has been put to similar use since before 1947 when the garage was built, except that the intensity of use has increased since that time.

In 1923 the entire area from 79th Street to 67th Street was zoned manufacturing. At that time the subject property was vacant, as it was until 1942 when a small trucking operation began. At the same time, the property was rezoned residential except for 125 feet of frontage which was zoned for business. In 1945 the property was rezoned to manufacturing. Plaintiffs' complaint states that a motor freight terminal was a permitted use under that classification, but there is no evidence in the record to that effect.

However, in 1953 and 1955 attempts were unsuccessfully made to have the property rezoned from family residence and business to a motor freight terminal district. The reason for the discrepancy could not be discovered. Nevertheless, as of 1957, the entire property was placed in an M1–1 Restricted Manufacturing District. A C4 motor freight terminal is not a permitted use in this classification.

The tentative proposal of Mid-West Emery is to construct a dock area and freezing room at the southwest corner of the property, approximately 82 feet by 100 feet and 20 to 25 feet high, at a cost of $300,000 to $400,000. Offices are planned for the upper level. It is projected that if the plan is carried out, the intensity of use of the property will increase significantly. The total business of Mid-West Emery is not expected to increase, but this plan will permit consolidation of the other three Chicago area facilities into a single operation.

Clearly, whether Mid-West Emery's operation is or is not now a motor freight terminal within the meaning of

the C4 zoning classification, the proposed improvement, if allowed, would place it squarely within that classification.

Mid-West Emery applied to the City Council of Chicago for an amendment of the present M1–1 zoning classification to a C4 Motor Freight Terminal District, which would permit construction of the proposed facility. The Commissioner of City Planning recommended rezoning the property to C4, but with reduced boundaries, so the C4 district would not be contiguous with the R2 residential area lying to the north of the property along 70th Street. A hearing was held at which sixteen witnesses appeared in opposition and 200 objectors filed petitions. The City Council deferred final determination on the matter which both parties treat as a denial.

The trial court decreed that the present M1–1 restriction deprived plaintiffs of their property without due process of law in violation of both the United States and Illinois Constitutions and, therefore, was null and void and unenforceable. It based its decision on its findings that Mid-West Emery is and has been operating a motor freight terminal facility continuously for approximately twenty years either in its present or corporate predecessor structure; that prior to 1957, this use was a lawful use; that the 1957 comprehensive amendments which zoned the subject property M1–1 Restricted Manufacturing prohibits motor freight terminal uses; that, consequently, the existing use of the property is a legal nonconforming use which cannot be enlarged or expanded; that plaintiffs' proposed expansion would be permitted under the terms of a C4 classification; that the highest and best use of plaintiffs' property is for a motor freight terminal facility; that plaintiffs will suffer irreparable injury if prevented by the zoning ordinance from expanding the present use to its full extent; that such expansion would not adversely affect the residential property in the area; that the present restriction bears

no relation to the public health, safety, morals, convenience and general welfare of the people; and, that plaintiffs have exhausted all available administrative remedies for relief.

 The applicable zoning principles are well settled that there is a presumption in favor of the validity of a municipal zoning ordinance, and the burden is upon the party attacking the validity of the ordinance to prove by clear and affirmative evidence that it is unreasonable and capricious and bears no reasonable relation to the public health, morals, safety and welfare. Martin v. City of Rockford, 27 Ill2d 373, 374, 189 NE2d 280 (1963), Trendel v. County of Cook, 27 Ill2d 155, 161, 188 NE2d 668 (1963). Where the most that can be said is that the reasonableness of the ordinance is fairly debatable, the decision of the municipal authorities must be upheld and the trial court is not justified in substituting its judgment for that of the municipal authorities. Cosmopolitan Nat. Bank of Chicago v. City of Chicago, 22 Ill2d 367, 372, 176 NE2d 795 (1961).

██ Plaintiff contends that the present M1-1 zoning classification is not in conformity with existing uses in the area, and defendant asserts that it is. Illinois courts have consistently stated that the question whether or not a zoning classification is in conformity with surrounding existing uses and the zoning classification of nearby property is of paramount importance. Chicago Title & Trust Co. v. City of Harvey, 30 Ill2d 237, 195 NE2d 727 (1964), River Forest State Bank & Trust Co. v. Village of Maywood, 23 Ill2d 560, 179 NE2d 671 (1962), LaSalle Nat. Bank v. City of Chicago, 6 Ill2d 22, 126 NE2d 643 (1956).

Plaintiff asserts that the character of the subject property is established by the Nalco Chemical plant on the south, zoned M2-2 General Manufacturing, the network of railroad tracks and freight yards to the southwest, across which is Ford City containing areas zoned B5-2,

435

M1-1, M2-2 and C4, the small alkali plant to the north-west zoned M1-1, the heavily trafficked Pulaski Road to the east and the plaintiffs' own use zoned M1-1 which it claims is a motor freight terminal.

Defendant, on the other hand, points to the three-block, single-family residential area north of the subject property zoned R2 and the residential development zoned R2 and R3 located on the east side of Pulaski beyond the business uses which front on Pulaski. All of the above uses were existing when the 1957 ordinance was enacted. Plaintiffs' contention that the residential area to the north is only a small pocket of homes is contrary to fact. Map 16–K of the Chicago Zoning Ordinance shows that this residential area extends as far as 63rd Street on the north, but the area is narrowed on the south by the irregular north boundary of the subject property and of the M1-1 and M2-2 area to the west which, as it runs west, bends around first to 69th Street and, as it approaches Cicero Avenue, extends as far north as Marquette Road (6700 south).

The subject property is thus located between two large, diverse uses, so that it is difficult, if not impossible as a practical matter, to say that any zoning classification would be in conformity with the entire surrounding area.

Plaintiffs' expert witness, William S. Lawrence, a city planning and zoning consultant for eighteen years, testified that the existing and proposed use is compatible with the surrounding area, including the residential area to the north. He stated that the highest and best use of the subject property is for "the continuation of a truck terminal as permitted under the C4 classification of the Chicago Zoning Ordinance," indicating that he believed the present use qualified as a motor freight terminal. He further testified that a motor freight terminal, in his opinion, was no more heavy a use than those uses now permitted under the present M1-1 clas-

436

sification. Such uses include auto laundries, garages and parking lots, and storage, warehousing and wholesale establishments, provided they are within the performance standards for that classification.

On the other hand, the City's expert zoning witness and city planner, Richard McKinnon, testified that, in his opinion, the expansion of plaintiffs' present use to a motor freight terminal would be an incompatible use of land adjacent to a residential area, but that the unimproved land would be ideal for light manufacturing for which it is now zoned. "So, therefore, you have a single-family residential area to the north of the subject property; south, you have the manufacturing, restricted manufacturing (referring to Mid-West Emery's property). This is proper zoning. South of the M1 you have the M2, General Manufacturing District. Again, this is proper zoning. You have a degree of zoning districts set up which fall under the principles of land use and zoning. A C4 would not be—would be completely incompatible with this grading of land uses." It was also his opinion that, after five or six field trips to the property, the plaintiffs' present operation was not a motor freight terminal facility because that classification requires the storage and/or assemblage of goods for routing in commerce, and implicitly requires the loading and unloading of goods at docking areas. On his inspections of the property, he testified he saw only the parking and repair of trucking equipment which does not qualify as a motor freight terminal. But he admitted on cross-examination that his opinion was based only on his observations to that date and that further study would be necessary to determine whether it fell outside the classification.

■■ Consequently, the evidence shows that the subject property lies between two diverse uses, and it cannot be said that the subject property derives its character entirely from either of them. As stated in Jans

v. City of Evanston, 52 Ill App2d 61, 68, 201 NE2d 663 (1964), "(a) party challenging the validity of a zoning ordinance has the burden of showing by evidence that is clear and convincing that the city has abused its legislative discretion in classifying property in a certain manner. Such proof must establish not merely that the property could reasonably be classified otherwise, nor indeed that the court would classify it otherwise; rather it must show that the legislative decision as to the property is clearly unreasonable." Plaintiffs have not met this burden where the subject property is bordered partly by a residential area and partly by a manufacturing area, and the property has been shown to be properly suited for its present M1–1 classification.

Plaintiffs next contend that denial of their application to rezone the subject property to a C4 classification was unreasonable, arbitrary and discriminatory. To support their charge of discrimination, plaintiffs point to the C4 motor freight terminal area located to the west of their property, across the large network of Belt Line railroad tracks and freight yards and a strip of land zoned M2–2, which has been periodically expanded by amendment within the Ford City development. Due to this expansion, the west edge of plaintiffs' property is several hundred feet from the east edge of the Ford City C4 district. But the entrance to the latter is on Cicero Avenue, a mile west of the entrance to Mid-West Emery on Pulaski. In addition, the Ford City motor freight terminal area is separated from the residential area by the same railroad tracks and an area zoned M1–1. This development is separated on the south from a residential area at 77th Street by an M2–2 and a B5–2 and borders on the city limits on the west.

The thrust of this contention is plaintiffs' allegation that they were operating a motor freight terminal, within the meaning of a C4 classification, prior to the enactment of the present ordinance, and periodic enlargement

438

of Ford City's C4 area caused the City Council's denial of their request for expansion to be discriminatory.

According to the testimony of Mr. McKinnon, there are presently four large areas in the City of Chicago designated as motor freight terminals. The zoning ordinance contemplated that 75 to 100 individual truck terminals would be located at each of these locations, which in turn, were located adjacent to major city thoroughfares. The purpose of this planning was to prevent traffic congestion and accidents and to regulate noise, air pollution and heavy use of the streets in the city.

In view of this policy of the Chicago Zoning Ordinance and the unique characteristics of a motor freight terminal district, the cases cited by plaintiffs (Marquette Nat. Bank v. Village of Oak Lawn, 57 Ill App2d 31, 206 NE2d 531; Colvin v. Village of Skokie, 54 Ill App2d 22, 203 NE2d 457; Polivka v. County of Cook, 68 Ill App2d 377, 216 NE2d 221), are distinguishable from the present case. In each of those cases, the plaintiff applied for an amendment to permit a use commonly found in a commercial district, such as a gas station or drive-in restaurant, and the application was denied even though similar uses were located nearby. Those courts correctly held that such selective zoning was discriminatory. In this case, however, the Chicago City Council has determined that, due to the nature of a motor freight terminal, all such facilities should be consolidated into four strategic locations within the city. Plaintiffs have adduced no evidence to show that this determination is unreasonable. Consequently, it is presumed to be valid.

■ ■ Furthermore, plaintiffs have failed to prove discrimination in the present case. As stated in Mundelein Estates v. Village of Mundelein, 409 Ill 291, 294, 99 NE2d 144 (1951), a case analogous to this one, "(t)he mere presence of buildings or areas being put to use to which the person attacking the validity of a zoning ordinance seeks to put his property, is a wholly insuf-

ficient circumstance to show that the ordinance was invalid or discriminatory as to the property of the one assailing the ordinance. (Citing cases.) The fixing of boundary lines is a matter of legislative discretion and necessarily results in a different classification on either side of the boundary line. This does not render limitations on the use of property near the boundary line in a more restricted district unreasonable or invalid. . . . Appellant's contention that it is unreasonable to allow a commercial classification to a neighbor, and deny the same classification to their property, would lead to a conclusion that an entire residential area could be progressively rezoned until the whole area was commercialized."

The Ford City C4 area is separated from the residential area by a wide area of railroad tracks and a strip of land zoned M2–2, thus providing a buffer area, while Mid-West Emery's land is immediately adjacent to that area. In addition, Mr. McKinnon testified that further enlargement of the Ford City C4 district would be permissible from a planned use point of view so long as it remains south of the Belt Line tracks. Furthermore, the traffic hazards created by these motor freight terminals would be centered around the entrance to each district, which entrances are located at least one mile from each other, and this traffic hazard is one of the major factors for creating the C4 district.

Plaintiffs next contend that the particular facts in this case require a finding that the present restriction is invalid. Plaintiffs correctly state the principle that each zoning case must be decided on its own facts. Marquette Nat. Bank v. Cook County, 24 Ill2d 497, 501, 182 NE2d 147 (1962). The particular facts asserted by plaintiffs which require such a finding include the nature of the surrounding area, notably the moderately heavy-trafficked Pulaski Road, the Nalco Chemical plant, the Belt Line Railroad and Ford City development, the testimony of Mr. Lawrence that the highest and best use

of the property is for a motor freight terminal, that the Planning Commission recommended a reclassification of the property to C4, and that the tax base would be increased by $300,000 to $400,000 so additional revenues would be realized, and plaintiffs' allegation that they are operating a motor freight terminal now as well as when the homes to the north were built.

█ The evidence adduced by defendant shows that there is a substantial residential area which will be affected by this improvement, that there is a conflict as to the highest and best use of the property, that the Planning Commission recommendation was for a reduced area within the subject property and was rejected by the City Council, and that traffic hazards would be increased if the improvement were allowed. The fact that the tax base would be increased is true in every zoning case where the use of property is restricted, and this factor is not entitled to substantial weight. In addition, the evidence does not support plaintiffs' allegation that the residential area developed while the subject property was being used for its present operations.

Mr. Rubenstein, Secretary and Vice President of Mid-West Emery and manager of the subject premises, testified that the present operation is substantially the same as when he came there in 1952. However, the only evidence of the property's use prior to that time is testimony that the office and garage facility was built in 1947 and that some trucking business began there in 1942, but there is no evidence of the nature of that use. One of the neighbors testified that she thought the building was going to be a grocery store when it was first built, and another testified that the operation was so small in 1950 that they did not pay much attention to it. On the other hand, the evidence shows that intense residential development took place immediately after World War II when the use of the subject property was not offensive to a residential area. Obviously, these sin-

gle-family residences were not built while the subject property was being used for its present operations, and the most that has been shown is that the two adjacent areas developed simultaneously.

Consequently, there are no particular facts which require a finding that the present restriction is unreasonable. The most that has been shown by plaintiffs is that the reasonableness of the restriction is fairly debatable, and in such a case, the decision of the municipal authorities must be upheld and the trial court is not justified in substituting its judgment for that of the City Council. Cosmopolitan Nat. Bank of Chicago v. City of Chicago, 22 Ill2d 367, 372, 176 NE2d 795 (1961).

 Plaintiffs next contend that the present M1-1 zoning restriction prohibiting them from expanding their present use imposes an economic hardship. But plaintiffs have shown no actual financial loss. Their own valuation expert testified that the land is worth approximately $1,000,000 for both the present and proposed uses and that any increase in value of the property would be equal to the cost of the proposed improvement. Nevertheless, they claim that their inability to economically develop all of their property and consolidate their four Chicago locations constitutes a hardship. It has been recognized that "(h)ardship of zoning upon an owner is not confined solely to difference in value because of a restrictive classification, but it may be caused by inability to economically develop by reason of the restriction." LaSalle Nat. Bank v. County of Cook, 28 Ill2d 497, 500, 192 NE2d 909.

Defendant argues that no such hardship has been shown because there is no evidence that consolidation of plaintiffs' operations is prevented by the present zoning. This argument presumes that plaintiffs are not now operating a motor freight terminal which cannot be expanded under the Chicago Zoning Ordinance.

■ Despite defendant's argument, the fact that plaintiffs' proposed improvement would place it squarely within the definition of a C4 Motor Freight Terminal District and is thus prohibited by the present M1–1 classification, is sufficient to give plaintiffs a basis for challenging the validity of the ordinance as applied to their property. The critical question is not the degree to which plaintiff is restricted, and thus injured in the use of its property, but whether that restriction, regardless of the hardship which it imposes, is justified by a benefit to the public health, safety and welfare.

■ As stated in Stemwedel v. Village of Kenilworth, 14 Ill2d 470, 474, 153 NE2d 79 (1958):

> "To sustain the burden of proving the invalidity of the restriction it is not enough to show that it works a hardship on the owner, or that a desired variation would not substantially impair the public health, safety, comfort, morals or general welfare. One who assails the constitutionality as applied to a particular property must prove by clear and affirmative evidence that it constitutes arbitrary, discriminatory, or unreasonable municipal action, and that it will not promote the safety and general welfare of the public."

Plaintiffs next contend that the public derives no benefit from the present restriction.

There is conflicting evidence as to the depreciatory effects of the proposed improvement on the immediately affected residential area. Plaintiffs' valuation expert, John McNamara, a real estate broker, appraiser and developer, testified that a change in classification to C4 would have no deleterious effect on the new homes immediately adjacent and abutting the area. He stated that any deleterious effect that there would have been on those homes had already been taken, due to the fact that

this use was there before their construction, and, therefore, any deleterious effect would already have been absorbed by plaintiffs' use. William Lawrence, plaintiffs' city planning and zoning consultant, also testified that in his opinion the proposed expansion would not adversely affect the neighborhood or traffic patterns in the area. Harold Rubenstein testified that the proposed loading dock area is to be located in the southwest corner of their property where, plaintiffs argue, it will have the least adverse effect, if any.

Defendant also produced two real estate experts. John Williams, a realtor for thirty-five years in the Chicago area, testified that the expansion of Mid-West Emery's operation would cause a further depreciation of 5% to 10% in the value of the homes. Intervenor's witness, Louis Travis, a real estate broker for ten years, who has arranged sales in this area, testified that the minimum depreciation would be 10%. He testified to the effect that it is not the location of the proposed docking area which determines the depreciatory effect, but rather the increased commercial activity or intensification of the use which further depreciates the property, and that further depreciation will occur with increased activity.

The trial court considered that the critical testimony on this point was that of Robert McKinnon, defendant's city planning expert, who stated, when asked whether the proposed use would further depreciate buildings in the surrounding area, "I think the damage is done."

Defendant argues, however, that Mr. McKinnon is an expert on city planning, not on real estate valuation, and that his testimony was based on his education and experience in the field of planning. Defendant also argues that plaintiffs have admitted that their use has a depreciatory effect on the adjacent residential area, and the conclusion is unavoidable that expansion and intensification of plaintiffs' present use will further damage

444

and depreciate the residential district. We agree with defendant's argument "that there is a distinction between bad and worse."

Plaintiffs next argue that the proposed expansion would not adversely affect traffic in the area since the increase of 50 to 100 vehicles per day is not a significant increase over the present traffic level of Pulaski Road which was shown to be more than 22,000 vehicles during a twelve-hour period. There was evidence to show that no traffic accidents had occurred at plaintiffs' main driveway midway between 70th and 71st Streets, or involving any of Mid-West Emery's trucks in that area for several years.

Defendant city argues that its main concern is not merely the increase in number of vehicles, but the increase in traffic congestion and hazards caused by these additional 50 to 100 trucks turning on and off Pulaski Road. Defendant demonstrated by use of a template, showing the minimum turning radius of trailer trucks like Mid-West Emery's, laid over a scale drawing of plaintiffs' existing driveways, that trucks approaching from the north could not make the turn into the driveway at 71st Street, which is now closed, but would be opened if the proposed use were allowed, unless they turn from the left-hand side of the roadway. One of defendant's traffic experts testified that due to this condition, the city would not grant a permit to use that driveway and that trucks turning from the lefthand lane definitely would increase the accident potential. Consequently, plaintiff contends it will continue to use the larger 66-foot driveway at the center of the lot which purportedly is large enough to accommodate trucks turning from the right-hand turn lane when approaching from the north.

However, Lincoln Griffith, a traffic engineer, testified that he had observed a trailer truck leaving that driveway and turning south, that had to pull over to the

median strip to make the right turn. He testified that this condition would be very hazardous in the evening rush hour traffic and would introduce potential right-angle collisions.

In addition, several owners of homes in the affected area who were intervenors in this action testified that Mid-West Emery's truck drivers ignore the five-ton load limit on their residential streets, drive the wrong way on 70th Street, which is one-way east from Kedvale to Komensky, and drive over the curbs and sidewalks near 70th Street. Other testimony by these neighbors consisted primarily of complaints that the trucks were a hazard to school children in the area, that the loud noises of the trucks and repair shop continue all night, that plaintiffs store junk trailers in the rear which are an eyesore, that Mid-West Emery's parking lot is higher than 70th Street so that in rainstorms the water drains into the street, flooding the sewers and basements of the residences, that Mid-West Emery drains fuel oil into the street which runs into the sewers and causes a gas smell in the basements, that the Fire Department has had to flush the street and sewer twice and the basement of one of the homes, that the trucks sometimes block 70th Street making it difficult for the residents to get through or park their cars, that the drivers use profane language to the women if they are questioned, that a refrigeration plant would bring additional smells and odors, that Mid-West burned old crates and trash in the open, causing offensive smoke and odor, that they object to intensification and expansion of the present use because each of these complaints will increase and the value of their homes will be further depreciated.

Plaintiffs offered no evidence to the contrary, but Mr. Rubenstein testified that he was not aware of these complaints.

■ ■ Plaintiffs also assert that these nuisance complaints are irrelevant in a zoning case and are, in-

446

stead, matters for local enforcement officers, relying on Herman v. Village of Hillside, 15 Ill2d 396, 155 NE2d 47 (1959). In that case, plaintiffs sought to expand their quarrying operation which was a nonconforming use. Residents testified as to the annoyance and discomfort caused by plaintiffs' blasting operations, causing noise, vibration and dust. Defendants argued that limitation on expansion was proper when the operation is a nuisance in fact. The court replied after an examination of the nuisance evidence: "In any event, this is not a nuisance case, and we must view it from the principles applicable to zoning." It is unquestionably correct that nuisance and zoning cases are not determined on precisely the same principles. In fact, the restricted use need not constitute a nuisance to authorize enactment of a zoning ordinance. 58 Am Jur 941, § 3, Zoning.

It is clear in the Herman case that the court considered these nuisance complaints as a factor in its decision, but that countervailing factors, such as—that the quarry had been in existence for many years prior to the residential area, that the plaintiffs would suffer severe financial loss, that the quarry was distinctly beneficial to the community and that the residential owners could show no material effect on their property, warranted the finding that the restriction against expansion was invalid.

Indeed, though legal enforcement may be available to the intervenors to force compliance with the applicable performance standards, this fact should not deprive these persons of the protection against intensification of offensive uses intended to be provided by the Chicago Zoning Ordinance which prohibits expansion of nonconforming uses. The nuisance testimony of the residents is relevant to show the present use to which plaintiffs are putting their property, and to tend to show the effect which the intensification of this use will have on their residential property.

447

As defendant points out, there is a close relationship between zoning and laws prohibiting nuisances. In Euclid v. Ambler Realty Co., 277 US 365, 387 (1926), where the constitutionality of zoning was upheld, the United States Supreme Court noted:

"There is no serious difference of opinion with respect to the validity of laws and regulations fixing the height of buildings within reasonable limits, the character of materials and methods of construction, and the adjoining area which must be left open, in order to minimize the danger of fire or collapse, the evils of overcrowding, and the like, and *excluding from residential sections offensive trades, industries and structures likely to create nuisances.* (Emphasis added.)

Plaintiffs next contend that the conflicting testimony as to the highest and best use of the property, the nature of the present use of the property, the potential depreciatory effect on the residential area, the potential traffic hazards and the complaints of plaintiffs' failure to comply with applicable performance standards, does not make the validity of the ordinance debatable. The rule has been stated that "(m)ere conflict of testimony as to the highest and best use of property, the impact of the proposed use on the areas involved or its effect upon property values, does not make irrebuttable the presumption that an ordinance is valid. Where the evidence shows a destruction of property value by application of an ordinance, the legislation may be justified only if it substantially promotes the public health, morals, or general welfare." Illinois Nat. Bank & Trust Co. of Rockford v. County of Winnebago, 19 Ill2d 487, 167 NE2d 401; Bauske v. City of Des Plaines, 13 Ill2d 169, 148 NE2d 584.

However, the rule has also been stated:

> "Before a court will intervene it must be established by clear and convincing evidence that the ordinance, as applied to plaintiffs, is arbitrary and unreasonable and has no substantial relation to the public health, safety or welfare. These rules are based upon a recognition that zoning is primarily a legislative function, subject to court review only for the purpose of determining whether the power, as exercised, involves an undue invasion of private constitutional rights without a reasonable justification in relation to the public welfare. (Citing cases.) *Where it appears, from all the facts, that room exists for a difference of opinion concerning the reasonableness of a classification, the legislative judgment must be conclusive.* (Citing cases.)" Exchange Nat. Bank of Chicago v. County of Cook, 25 Ill2d 434, 440, 185 NE2d 250. (Emphasis added.)

The case of Franz v. Village of Morton Grove, 28 Ill2d 246, 190 NE2d 790 is not dispositive of this issue as plaintiffs contend. In that case there was a substantial financial loss to plaintiff due to the residential zoning restriction, and the affected residential area was insulated from the subject property by vacant land, athletic fields and parking lots. In the present case plaintiffs have not proved an irreparable injury since they may build their docking area in the Ford City C4 district and their unimproved land has been shown to be suitable for light manufacturing which is now a permitted use at no financial loss to plaintiffs. In addition, there is no buffer area between the residential area and subject property in this case. Other cases cited by plaintiffs are similarly distinguishable, and in a zoning case where each case must be decided on its particular facts, a review of each

of these cases is unnecessary. We believe that the testimony in the present case demonstrates, at the least, a difference of opinion as to the reasonableness of the present classification.

 Finally, the plaintiffs contend that the findings of the trial court cannot be disturbed unless contrary to the manifest weight of the evidence. Bauske v. City of Des Plaines, 13 Ill2d 169, 148 NE2d 584. The rule is as correct as plaintiffs assert and as stated in Atkins v. County of Cook, 18 Ill2d 287, 297, 163 NE2d 826 (1960): "In all cases of this nature there is a conflict of opinion testimony. The credibility of witnesses is of great importance. In a trial without a jury the findings of the trial court will not be disturbed unless manifestly against the weight of the evidence."

The trial court placed great significance on (1) the recommendation of the Planning Commission that the property be rezoned C4, although it was rejected by the City Council, (2) its finding that most of the people in the immediately affected residential area bought or built their homes after the trucking facility came into existence, and (3) the testimony of Robert J. McKinnon, a city planner of twelve years experience, who, in response to a question whether the proposed improvement would damage the surrounding property, stated that in his opinion the damage had already been done.

First, it seems patent that the recommendation of the Planning Commission is not entitled to great weight since it was not subject to cross-examination, the basis of the recommendation is not apparent, the report was not based on an adversary hearing, it recommended a change only as to a portion of the property, and the City Council, after an adversary hearing, rejected the recommendation. Surely, an administrative report is not entitled to more weight than the decisions of the rule-making body itself.

450

Secondly, the record does not support the court's finding that the residents bought or built their homes after the trucking facility came into existence. Five homes were in this area prior to 1942. Further development occurred consistently after World War II at about the same time that the present office and garage were built. There is no evidence to show that the operation was a motor freight terminal at any time prior to 1952. The fact that some small trucking facility was in operation on the subject property does not warrant the conclusion that they should have anticipated the development of a full scale motor freight terminal. They, too, were entitled to rely on the residential classification of their property and the protection which it purports to provide.

Finally, if the trial court relied so heavily on the testimony of Mr. McKinnon that in his opinion "the damage was done," it must also have considered his testimony that the highest and best use of plaintiffs' property is for light manufacturing, that a restriction to M1–1 constitutes a good grading of uses, that a motor freight terminal is incompatible with a residential area and that, in his opinion at that time, plaintiffs were not operating a motor freight terminal, but a truck repair and parking facility.

Consequently, plaintiffs have failed to show by clear, convincing and affirmative evidence that the ordinance, as applied to the subject property, its arbitrary and unreasonable. The evidence in this case, viewed most favorably to the plaintiffs, fails to overcome the presumption of validity of the ordinance. At best, the evidence discloses a legitimate difference of opinion concerning the reasonableness of the challenged zoning classification in its application to the subject property. In such a case, legislative judgment of the municipal

authorities must be respected. Bolger v. Village of Mount Prospect, 10 Ill2d 596, 141 NE2d 22 (1957).

The judgment of the Circuit Court of Cook County is reversed.

Judgment reversed.

EBERSPACHER, J., concurs.

GOLDENHERSH, J., dissenting:

I respectfully dissent from the majority opinion and would affirm the judgment. I agree with the circuit court that subjecting plaintiffs' property to the restrictions of an M1–1 classification bears no relation to the public health, safety, morals, convenience, or general welfare. In my opinion denial of the application to rezone plaintiffs' property to a C–4 classification is unreasonable and arbitrary.

A detailed traffic volume study prepared by the Chicago Bureau of Street Traffic shows a count of 27,484 vehicles passing the intersection of 71st Street and Pulaski Road in a 12-hour period, as of May 25, 1965. Of this number 22,669 were traveling north or south on Pulaski Road. In keeping with the trend of increase in vehicular traffic, it may safely be assumed that in the intervening 4½ years the volume has been substantially increased.

It is difficult to perceive in what manner the operation of a truck terminal west of Pulaski Road could generate noises distinguishable east of Pulaski Road from the roar of 22,669 vehicles. Nor does the record reflect what the operation of a truck terminal could possibly create which could be as odious as the smoke shown billowing out of Nalco's plant in plaintiffs' exhibit number 5.

452

With respect to the area lying north of West 70th Street, Map 16–K attached to the Zoning Ordinance shows that only two streets, Karlov and Komensky, extend south as far as West 70th Street. South Kedvale Avenue ends at West 70th Place, at least 100 feet north of West 70th Street and the other streets terminate at West 69th Street. The homes of the residents of Kolmar, Kilbourn, Kenneth and Kostner Streets lie considerably closer to the Chicago Belt Railway than to plaintiffs' property, and again it is difficult to perceive what noises could be created in a truck terminal which can be distinguished from those resulting from the adjacent railroad operations.

Section 9.8–4 of the ordinance provides that no building, structure, or other obstruction, nor any off-street loading operation shall be located within 100 feet of the boundary of a residence district, nor within 50 feet of the boundary of a business district. The proposed improvement is to be located in the westerly portion of the plaintiffs' parcel, well away from Pulaski Road or West 70th Street. It will occupy approximately 10,000 square feet in a parcel of land comprising approximately 560,000 square feet.

Assuming an additional 100 trucks per day will be routed into plaintiffs' yard, they are unlikely to be noticed in a traffic flow in excess of 22,000. Further, the evidence shows there have been no traffic accidents at the entrance to plaintiffs' property for a period of several years.

The complaints that 70th Street was blocked at times, that Mid-West burned crates and trash in the open or that drivers used profane language are not material to the issue presented. These involve violations of ordinances which have no connection with the proper zoning of land. It should be further noted that it would require quite a sizeable trash fire to create smoke equal in

volume to that shown pouring out of Nalco's stacks in plaintiffs' exhibits 3, 5, 7 and 9.

With heavily traveled Pulaski Road as a buffer, it is apparent that the residents of the area east of Pulaski are not affected by the change of classification from M1–1 to C–4. The ordinance provision for a 100-foot buffer is adequate protection for the residents of the area north of West 70th Street. Reversal of the judgment results in substantial injury to the plaintiffs without perceptible benefit to the public, and I would, therefore, affirm.